# Exhibit List

A– 1st police Report
B– 2nd police Reports
C– Event report
D– Negligence per se & violations of NHRA
E– NHRA itself
F– 'Sponser' Statute
G– 'Show cause' text calling ms. giebell – 'friend' to Mr Wu.
H– January trip texts – (proof of trip)
I– texts proving door was kept locked
J– photos taken by dublin police of Mr Wu
K– intimidation statute
L– death certificate Mr. Wu
M– pages showing ms. giebell prepared medications (first hand knowledge)
N– Texts & journal showing matches of medications of patient # 10, to Mr. Wu.
O– patient # 10's report – odh survey – obtained through foia
P– Notarized letters to police – trying to get out of 'warning'?
Q– Article stating hospice complaints / suits by others
R– Not assigned
S– Ohio Jursprudence quote on communicating false info
T– Mr Wu's Care journal
U– Texts proving days worked with Mr. Wu
V– Case Jalowy vs friendly Home
X– Not assigned
W– Diagram & photos of outside of house & yard

Show cause to allow police Reports

exhibit A

the defendant, unless the sources of information or other circumsta[nces] indicate lack of trustworthiness.[87] In other words, matters observed [by] police officers, when such evidence is not offered by the defendant, [are] excludible. The phrase, "excluding, however, in criminal cases mat[ters] observed by police officers and other law enforcement personnel," prohibits the introduction of reports that recite an officer's observati[ons] of criminal activities or observations made as part of an investigation of criminal activities. This phrase does not prohibit the introduction [of] records of a routine, intra-police, or machine maintenance nature, [such] as intoxilyzer calibration logs. Such routine records are highly likely [to] be reliable, and are precisely the type contemplated as admissible [under] the public records exception to the rule against hearsay.[88]

A law enforcement agency's investigative report is to be conside[red] proof of the facts stated therein, and the fact that such report [may] contain conclusions, or that some of the statements may conta[in] hearsay, does not make any part of the report incompetent evidenc[e].

◆ ***Observation:*** A computer print-out is inadmissible under the hearsay rule to establish the element of theft in a theft-related offense. The court of appeals in *Sims* opined that a computer print-out report is not reliable and trustworthy proof that an object has been stolen, adding that errors commonly occur in the recording, retention, and retrieval of computer information, and that a conviction for a theft-related offense cannot stand where a necessary element of the crime is demonstrated solely by reference to hearsay in

87. Evid R 803(8), discussed more fully in 43 O Jur 3d, Evidence and Witnesses § 440.

**Annotations:** Admissibility, over hearsay objection, of police observations and investigative findings offered by government in criminal prosecution, excluded from public records exception to hearsay rule under Rule 803(8)(B) or (C), Federal Rules of Evidence, 56 A.L.R. Fed. 168.

88. Evid R 803(8), discussed more fully in 43 O Jur 3d, Evidence and Witnesses § 440.

89. State v. Ward, 15 Ohio St.3d [...], 474 N.E.2d 300 (1984).

90. In re Grow, 7 Ohio Misc.2d [...], 454 N.E.2d 618 (Ct. Cl. 1983).

As to documentary evidence [gener]ally, see §§ 3056 et seq.

 Exhibit A

# INCIDENT/INVESTIGATION REPORT

**INCIDENT DATA**

| Field | Value |
|---|---|
| Agency Name | Dublin Police Department |
| ORI | OH0250300 |
| Case# | 18-001941 |
| Date / Time Reported | 08/01/2018 14:28 Wed |
| Last Known Secure | 01/16/2018 09:00 Tue |
| At Found | 08/01/2018 14:28 Wed |
| Location of Incident | 4075 W. Dublin Granville Rd, Dublin OH 43017- |
| Premise Type | |
| Zone/Tract | |
| #1 Crime Incident(s) (Com) | Incident Only<br>INCIDENT ONLY |
| Weapon / Tools | |
| Activity | |
| Entry / Exit / Security | |
| #2 Crime Incident ( ) | |
| Weapon / Tools | |
| Activity | |
| Entry / Exit / Security | |
| #3 Crime Incident ( ) | |
| Weapon / Tools | |
| Activity | |
| Entry / Exit / Security | |

MO

**VICTIM**

# of Victims 0 Type: Injury:

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| V1 | | | | | | | | |

Home Address / Home Phone

Employer Name/Address / Business Phone / Mobile Phone

VYR / Make / Model / Style / Color / Lic/Lis / VIN

**OTHERS INVOLVED**

CODES: V- Victim (Denote V2, V3) O = Owner (if other than victim) R = Reporting Person (if other than victim)

Type: INDIVIDUAL/ NOT LAW ENFORCEMENT Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|---|
| RP | BROWN, CODY | | | | | M | | | |

Home Address: 4075 W Dublin-granville Rd Dublin, OH 43017
Home Phone:
Employer Name/Address: Heartland Care, Same As Above (DIR OF ADMIN)
Business Phone: 614-210-0541
Mobile Phone:

Type: INDIVIDUAL/ NOT LAW ENFORCEMENT Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|---|
| IO | WU, SHIS KIN | | 02/20/1935 | 83 | A | M | | Resident | |

Home Address: 4075 W Dublin-granville Rd Dublin, OH 43017
Home Phone:
Employer Name/Address:
Business Phone:
Mobile Phone:

**PROPERTY**

1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Stolen 6 = Seized 7 = Recovered 8 = Unknown ("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Officer/ID#: JONES, T. C. (1116)
Invest ID#: (0)
Supervisor: LATTANZI, G. M. (1251)
Status: Complainant Signature
Case Status: Dpd - Closed 08/03/2018
Case Disposition: Closed 08/03/2018

# Incident Report Additional Name List

*Dublin Police Department*

OCA: *18-001941*

Additional Name List

| Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|
| 1) IO 2 | WU, KUEI | | 05/27/1957 | 61 | A | F |
| | Address 7547 Deer Valley Xing, Powell, OH 43065- | | H: 614-378-5919 | | | |
| | Empl/Addr | | B: - - | | | |
| | | | Mobile #: - - | | | |
| 2) IO 3 | WU, KEVIN | | 07/08/1986 | 32 | A | M |
| | Address 1020 E Broadway Ste B, Columbia, MO 65201- | | H: 614-378-5634 | | | |
| | Empl/Addr | | B: - - | | | |
| | | | Mobile #: - - | | | |
| 3) IO 4 | GIEBELL, JACQUELINE | | | | | F |
| | Address | | H: 276-920-0396 | | | |
| | Empl/Addr | | B: - - | | | |
| | | | Mobile #: - - | | | |

# INCIDENT/INVESTIGATION REPORT

*Dublin Police Department*

Case # *18-001941*

Status Codes: 1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Stolen 6 = Seized 7 = Recovered 8 = Unknown

| DRUGS | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

*RICKENBACHER, K.E. (1790)*

**Suspect Hate / Bias Motivated:**

NARRATIVE

The administrator of Heartland of Dublin called Dublin Police to report a third party complaint of abuse to one of their residents.

614-410-4920

# CASE SUPPLEMENTAL REPORT

614-410-4800

Printed: 08/03/2018 10:54

*Dublin Police Department*

OCA: *18001941*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *DPD - CLOSED* **Case Mng Status:** *CLOSED - CLOSED* **Occurred:** *01/16/2018*

**Offense:** *INCIDENT ONLY*

**Investigator:** *JONES, T. C. (1116)* **Date / Time:** *08/02/2018 09:12:46, Thursday*

**Supervisor:** *LATTANZI, G. M. (1251)* **Supervisor Review Date / Time:** *08/02/2018 10:22:27, Thursday*

**Contact:** **Reference:** *Patrol Supplement*

On 8-1-18 at 1244 hrs, Heartland of Dublin administrator, Cody Brown called Dublin Police to report a claim by a third party of abuse to one of their residents. Ofc. T.C. Jones #127 and K. Rickenbacher #136 responded to the scene and spoke to Brown.

Brown stated that previous caretaker for resident Shis Wu, Jackie Giebell had sent a letter to the regional director of operations, Jason Hohlefelder alleging observing signs of abuse to Wu. The observations were made in Jan of 2018 and again in May 2018 when she visited the Heartland facility where Wu is a current resident. (see attached letter). She alleged that a most likely a family member was abusing Wu and that there was bruising on his torso. She said she felt it wasn't Heartland staff members as she saw the injuries while Wu was in Va as well. It is unclear if she reported any of her concerns to police authorities in Va and a radio check of CAD showed that no contact was made by Geibell to Dublin Police.

Brown said per protocol they launched an investigation, part of which included a physical examination of Wu. (see progress notes report). No injuries were reported. Brown said a report was filed with ODH. Brown said Wu is incoherent most of the time and primarily speaks Taiwanese, giving yes or no answers . He said they attempted to interview him using language line with few results.

I asked Brown if he could accompany Rickenbacher and I to meet with Wu and to attempt an interview and observe his torso and other body areas to see if there were any obvious injuries.

Wu was in his room in bed with his ex wife and POA holder Kuei Wu and son Kevin Wu. He was unresponsive and I pulled up his pajama top and observed his stomach and back. I also observed his legs and arms. I did not see any obvious signs of recent or past injury, abrasions or bruising to Wu.

I spoke to Kuei Wu. She said she has never physically harmed Wu in any way and has not noted any injuries to him when he was in Va or at the current facility. Kuei Wu said that Giebell was hired, known to Wu's other son Jen Wu while Wu was in Va. Kuei Wu said that Giebell had never made her concerns known to her previously but they came to light when she left a cell phone for Wu on her last visit and Keui Wu disapproved. Both Geibell in her letter and Kuei Wu point to an argument over the phone and what she categorized as an unannounced visit to Wu in May by Geibell.

Not true

Kuei Wu is the POA for Wu and she said that she doesn't want calls, texts or any other future contact with Geibell. In addition Kuei Wu doesn't want Geibell to visit Wu at Heartland. Kuei Wu and her son, Kevin inquired about a

Investigator Signature Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 08/03/2018 10:54

*Dublin Police Department*

OCA: ***18001941***

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *DPD - CLOSED* **Case Mng Status:** *CLOSED - CLOSED* **Occurred:** *01/16/2018*

**Offense:** *INCIDENT ONLY*

**Investigator:** *JONES, T. C. (1116)* **Date / Time:** *08/02/2018 09:12:46, Thursday*

**Supervisor:** *LATTANZI, G. M. (1251)* **Supervisor Review Date / Time:** *08/02/2018 10:22:27, Thursday*

**Contact:** **Reference:** *Patrol Supplement*

restraining order against Geibell. I advised them to block her cell number and if she called to tell her not to call anymore. In addition they could contact the agency with jurisdiction (Powell or DCSO) to file a telecommunications harassment report if they receive any more calls, depending upon the location.

1-740-833-2800
1-614-885-5005

I spoke to Kevin Wu. He said that several different number come up on the caller ID when Geibell calls. I attempted to call the last number listed and got no answer. I asked Kevin Wu if he`d ever physically injured his father or known of anyone else purposefully injuring him. He said no. I also asked him if he`d ever seen any physical signs of injury to Wu. He said no.

Brown said he had finished his investigation and he could find no signs of abuse to Wu. Brown said that due to Kuei Wu`s request to not allow Geibell to see Wu, Geibell would not be welcome on the facilities grounds. In addition Brown would like all contact from Geibell to go through their legal department. I advised him that his legal staff should probably draft a certified letter banning her from the property and directing her where and how to send any further correspondence to the facility through their office.

At this time I am ending my involvement in the case. Neither Rickenbacher, nor myself could not see any obvious, signs of injury or abuse to Wu. Kuei Wu and Kevin Wu denied any instances of abuse to Wu or having seen any signs of injury to him in the past. I am unaware what the primary reporting responsibilities are for healthcare workers in Va., or even Geibell`s status as one, but no contact was made by her to Dublin Police concerning her concerns during her visit in May of this year.

Investigator Signature Supervisor Signature

Dear Regional Director of Operations, Jason Hohlefelder;

I appreciate the quick resolution of my last problem I reported to the company hotline.

However, I have a couple more things that will require more explanation and I thought it best to write them down in a letter to you.

My main reason for writing the letter is to provide information about a serious issue with a patient that is in the Heartland facility at Dublin, Ohio. And secondly, to protect my visitation rights with this same patient.

Before I get started with my concerns, I would like to introduce myself. The patient I will be referring to, is Mr Wu, Room 132A. I took care of Mr Wu when he was in Virginia, for 5 weeks in Dec 2016. And again last summer from May to September. Then Mr Wu went back to the Heartland Rehab. At that time, I was neither fired or dismissed from my position of caregiver of Mr. Wu, and assumed he might be coming back to Virginia at some point, as before.

I have a serious concern regarding Mr Wu. I have been monitering this problem since January. I have been making regular trips from Virginia to visit Mr. Wu. at the Heartland facility. On one of these trips, January 16, 2018, I noticed a dark purple bruise on Mr Wu's stomach. I was quite shocked because it was the same marks that I healed up 2 rounds of in Virginia last summer. Because of this, I can speak with confidence and say that the marks were NOT caused by anyone working at the Heartland facility. Because it has to be someone who had access to him, both in Virginia, and in ohio.

I checked the sign in sheet, and Mr. Wu had no visitors the week before my January visit (when I believe the marks were made). So I was able to conclude from that, that the marks were caused by someone who didn't sign in. I saw the marks when Mr Wu pulled the curtain to put the 'itch medicine' on his stomach. Then I saw the mark. I know from experience with healing up 2 rounds of bruises, that it takes approximately 3 weeks to heal up the marks and after a week or so, it starts to heal and itch. That's how I can say with reasonable certainty when the marks were caused. Also during my trip in May, I saw healed up marks on the opposite side of his stomach, I have not seen since August of last year. So the abuse was ongoing.

I got into an argument with Mrs. Wu during my trip in May, because I did not let her know I was coming to visit Mr. Wu. I did not tell her I was coming because she had been taking the phone away from Mr Wu when I called some. And I talked to him on one occasion and he started crying. Things have not been very good between us since then.

Because the marks in January were made right before my visit, I decided not to give any advance notice of my visits much. Because of this problem.

It is very important to me to maintain contact with Mr. Wu, as I am the only one who can identify the marks on him. And if I cannot be there to help Mr. Wu, it would only be easier for the abuser to continue the abuse.

I spoke with the administrator, and another manager about the abuse. But it was 'downplayed' and seemed like it wasn't taken seriously. But the 'healed up marks' are clearly visible on his stomach.

Want contact or be hurt anymore. "Someone is hitting him."

Reporting this has been very hard for me. Mr Wu is very quiet and a private person. That's why I chose to moniter the situation at first. When Mrs. Wu tried to force me out in May, Cody and Mariel intervened in my behalf. But I was worried that I would be forced out, and then what would happen to Mr Wu. So then I decided that I should say something.

My loyalty is very strong for Mr. Wu, and my boss, his son in Virginia. I feel I cannot allow Mr. Wu to be dishonored like this, without speaking out in his behalf.

I have included some paperwork, that I think might be helpful with the visitation issue.

Thank you for your concern and help with this problem. Chubb.

Sincerely,

Jacqueline Giebell

Jacqueline Giebell

Admitted Jan 1st. →

Mrs. Wu -
X-wife & Divorced -

– BIMS of 6 slightly competent. –

Wife visits every day. (M-F) Mr. Wu is not able to be his own person.

- No bruises on him currently

Ms. Wu is POA

Jackie -

* Did you make arrangements with a local A.L. to visit.

* Nothing on the nursing notes from Jan.
* nothing on Admission related to skin issues.

Cared for him Dec. 2016
May – Sept 20th 2017

- up to day Ms. Wu was ok with calling & visiting

---

Would like to speak w/ him every day.s

Last Judge did not see, only heard.

Same bruise last summer → Thought it was his boss – His Son; Thought it Might be

Dear Keui,

Thank you for letting me have this 4 months with Mr Wu and jen.

I have enjoyed this summer very much, dispite Mr Wu falling and all.

Also, I appreciated all your support last winter, and your encouragement, while I was waiting on Mr Wu to go to Jen's place.

I was also glad jen gave me extra time to be with Mr Wu this last month. That day jen say he was very worried for me. He try hard to hide his emotions, but was very worried for me, that day. I was really happy to see that because I believed that the good emotions was there all along & not just us fighting.

I feel bad Mr. Wu has to go back to the rehab, but glad he will get to see you. You are his wife, and he needs to spend time with you, now.

Thanks for all your encouraging texts this summer, also, I needed them.

I'm hoping to come & see Mr Wu on halloween.

Sincerely,
Jackie

 

**Cody Brown, LNHA**
Administrator

cody.brown@hcr-manorcare.com
hcr-manorcare.com

4075 W. Dublin Granville Rd.
Dublin, Ohio 43017-1436
614.356.4080
614.467.3814 fax
614.381.4485 cell

Exhibit B

# CASE SUPPLEMENTAL REPORT

Printed: 08/23/2018 16:20

OCA: *18001941*

*Dublin Police Department*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *DPD - CLOSED* **Case Mng Status:** *CLOSED - CLOSED* **Occurred:** *01/16/2018*

**Offense:** *INCIDENT ONLY*

**Investigator:** *JONES, T. C. (1116)* **Date / Time:** *08/06/2018 10:11:53, Monday*

**Supervisor:** *KEIFFER, K. (1149)* **Supervisor Review Date / Time:** *08/07/2018 14:33:48, Tuesday*

**Contact:** **Reference:** *Patrol Supplement*

At the direction of Det. Sgt. Krayer #108 I reinterviewed Brown and spoke to nurse Dezaray Thomas who did the "head to toe" examination of Mr. Wu on 7-31-18.

In addition I took photos of Mr. Wu where Ms. Giebell stated she had seen signs of injury.

Brown said Wu was initially a resident at Heartland on January 13, 2017 until Oct 10th when he moved to Va to live with his son Jin.

→ Also not true I took care of Mr. Wu May 12, 2017 to Sept 2 20 8

Brown said that Wu moved back into the facility on Jan 1st, 2018. A physical examination is done on patients who are away from their facility for more than 24 hrs, according to Brown, such as an overnight hospital stay. Brown is attempting to locate that report. He reiterated that the staff there are primary reporters and that any signs of injury or abuse are required to be reported to the police and ODH.

Brown described Mr. Wu as currently being non responsive in a "failure to thrive" situation, sleeping most of the time. I asked Brown what Wu was like in 2017. He said that he was mobile using a wheel chair. Brown said Wu used to wheel around the facility but not converse with anyone as Brown, Kevin and Keui Wu have all stated that Wu didn't and doesn't speak english. → Not true I have videos of him speaking english

Brown stated at this time Geibell can still visit Wu since he has not been deemed incompetent by a physician and would have to indicate to staff that he didn't want to see her. Brown said Wu is going to be examined by a doctor in the next day or so. If the Dr. deems Wu to be incompetent, the POA Kuei Wu has would take effect and they would address her wishes of not allowing Geibell to visit Wu. Brown said his main focus is the safety of his residents and the complete investigation of the allegation of abuse of Mr. Wu.

I met with Dezeray Thomas, LPN who did Wu's head to toe assessment. I asked her to explain the phrase " scattered dark pigmentation noted to left, right side of abdomen and bilateral lower extremities". Thomas stated that it meant Wu had differing color patches of skin on various areas of his body, none of which she attributed to a current or previous injury. I asked Thomas if she had seen any other evidence of previous or current injury to Wu when she did her assessment. She said she had not. Thomas was left a witness statement to fill out.

a lie, pictures taken by police show Numerous 'healed up' marks and also dark purple bruises,

Investigator Signature Supervisor Signature

 exhibit C

# COMMUNICATIONS

## Event Report

Event ID: **0182-190-509** Call Ref #: 900 Date/Time Received: 08/07/18 18:55:08

Rpt #:
Call Source: PHONE
Prime Unit: 169 TRAVES, DAVID Q
Services Involved: LAW

Location: **6565 COMMERCE PKWY**
Jur: CAD Service: LAW Agency: DPD
X-ST: St/Beat: D4 District: RA:
GP: D403
Business: DUBLIN JUSTICE CENTER Phone: (614) 889-1112

Nature: **19R-PHONE MESSAGE** Alarm Lvl: 1 Priority: 6 Medical Priority:

Reclassified Nature:

Caller: GIEBELL,JACKIE Alarm:
Addr: Phone: (276) 228-5648 Alarm Type:

Vehicle #: St: Report Only: No Race: Sex: Age:

Call Taker: ALGIPM Console: DISPCON2-7

Geo-Verified Addr.: Yes Nature Summary Code: STAP Disposition: A Close Comments:

Notes: Mrs. Giebell called yelling at this calltaker regarding an incident that occured at the heartland of dublin- she referenced 169 /136/183/127- she was upset this calltaker didn't know what other agency had jurisdiction over heartland of dublin - and became more upset when told Dublin Police have jurisdiction there and said 183 had told her two other agencies had jurisdiction- she was upset I had no answers regarding the incident- multiple times she was offered to speak to 169's supv or the Sgt on duty to which she refused-she finally asked for the 19 for Powell Pd and DCSO and the Chief's name- which she was given- she advised she would follow up with 183 tomorrow after 22 minutes of yelling at this calltaker upset because I did not know why 169 told her she was being charged with telecommunications harassment and why it didn't get dropped because 183 said it would because he had spoke to cooperate at Heartland of Dublin- email sent to 183 regarding incident [08/07/18 23:43:01 SKIPSR] [08/07/18 23:45:29 SKIPSR]
CORR USE HOUSE PHONE (5648) [08/07/18 20:39:19 BANTJW]
HAVE HIM CALL 276-920-0928 [08/07/18 20:14:59 ALGIPM]
This is a reopened incident. [08/07/2018 20:14:40 ALGIPM]
[redacted] [08/07/18 20:14:23 ALGIPM]
for 169 [08/07/18 18:55:48 ALGIPM]

### Times

| | | Time From Call Received | |
|---|---|---|---|
| Call Received: | 08/07/18 18:55:08 | | |
| Call Routed: | 08/07/18 18:57:17 | 000:02:09 | |
| Call Take Finished: | 08/07/18 18:57:17 | 000:02:09 | |
| 1st Dispatch: | 08/07/18 19:29:59 | 000:34:51 | *(Time Held)* |
| 1st En-Route: | 08/07/18 21:02:41 | 002:07:33 | |
| 1st Arrive: | 08/07/18 21:02:41 | 002:07:33 | *(Reaction Time)* |
| Last Clear: | 08/07/18 21:11:26 | 002:16:18 | |

| | | |
|---|---|---|
| Unit Reaction: | 001:32:42 | *(1st Dispatch to 1st Arrive)* |
| En-Route: | 001:32:42 | *(1st Dispatch to 1st En-Route)* |
| On-Scene: | 000:08:45 | *(1st Arrive to Last Clear)* |

### Radio Log

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| 169 | 4119 | D | Dispatched | 08/07/18 19:29:59 | Stat/Beat: D2 | | BANTJW |
| 169 | 4119 | DXY | DispatchXY | 08/07/18 19:29:59 | 1797604.05,767383.35 | | BANTJW |



McKnight's
LONG-TERM CARE NEWS

Exhibit D

News

August 27, 2019

# Nursing Home Reform Act violations can be part of negligence lawsuit, court says

Danielle Brown

A family member suing a skilled nursing facility for negligence can move forward with her la wsuit that cites the Federal Nursing Home Reform Act, a court ruled this week.

While the U.S. District Court for the Middle District of Georgia agreed that Ange Davis can't sue directly for violations in the Act, she can move forward with negligence per se claims. Da vis is suing Golden Living Center in Tifton, GA, related to her mother's death in 2016, in whic h she says the care violated federal law.

Golden Living argued the Federal Nursing Home Reform Act was not intended for private rig ht of action. But the court said Davis' mother is who the law was meant to protect.

Her mother "belongs to the class of persons the statute was intended to protect as she was a resident of a long-term care facility, the alleged harm she suffered was of the same harm the regulations were intended to protect against, and even if, at this juncture, the Court cannot s ay with certainty that Defendant's violation of those regulations proximately caused the inju

ries suffered by Plaintiff's mother, a causal connection exists between the violation and the harm suffered," the court wrote.

Golden Living did not return calls by production deadline.

ALSO ON MCKNIGHT'S LONG-TERM CARE NEWS

12 days ago • 6 comments

More than 80% of all COVID-19 deaths in Canada are from …

11 days ago • 7 comments

The administration's failure to "adequately prepare for the COVID-19 pandemic" …

11 days ago • 1 comment

The Global Council on Br… Health has released a set of recommendations …

**McKnight's Long-Term Care News Comment Policy**

Please read our Comment Policy before commenting.

**0 Comments** **McKnight's Long-Term Care News** **Disqus' Privacy Policy** **Login**

**Sort by Best**

**Recommend** **Tweet** **Share**

Start the discussion…

LOG IN WITH

McKnight\'s Long Term Care News

OR SIGN UP WITH DISQUS ?

Name

Email

Password

exhibit E

| (F) Right to privacy/confidentiality/communicatior | |
|---|---|
| Right to personal privacy in accommodations, medical treatment, written and telephonic communications, personal care, visits and meetings with family and resident groups | 4: U §· 2: (1 |
| Right to privacy in oral, written, and electronic communications | 4: |
| Right to reasonable access to and privacy in use of electronic communications such as email and video communications and for Internet research | 4: |
| Right to reasonable access to telephones and to make and receive confidential calls, including the right to retain and use a cellular phone at the resident's expense | 2: §· |



Call Now: 888.818.1439

VIEW BL

Do I Have A Case? 888.8

HOME ELDER ABUSE NEGLIGENCE INJURIES LEGAL ACTION ASSISTED LIVING RESOURCES ABOUT US 888.81

# Nursing Home Reform Act

Home > Resources > Nursing Home Reform Act

The Nursing Home Reform Act (NHRA) was established to ensure that nursing home residents receive the "highest practicable" mental, physical, and psychosocial wellbeing. The Nursing Home Reform Act enforces quality care and the provision of certain services to nursing home residents. Additionally, it establishes a Bill of Rights for residents.

The Nursing Home Reform Act is in place as a guideline for facilities that wish to receive state funding for Medicare and Medicaid services. Facilities receiving funding are required to meet the criteria set forth by the Nursing Home Reform Act. The state is responsible for certifying nursing home facilities that substantially comply with these criteria.

## Nursing Home Reform Act Background

Congress asked the Institute of Medicine to conduct a study to evaluate the quality of care in U.S. Medicare and Medicaid nursing homes. The results of this 1986 study revealed that nursing home residents were often neglected, abused, and cared for inadequately. As a solution to these issues, the Institute of Medicine proposed a series of sweeping reforms. In 1987, many of these reforms became law, including the Nursing Home Reform Act. The Act was part of the 1987 Omnibus Budget Reconciliation Act.

**Residents' Bill of Rights**

Under the Nursing Home Reform Act, nursing home residents are entitled to a basic set of rights. These rights are in place to protect each resident's privacy, individuality, dignity, and medical needs. The Nursing Home Reform Act's Bill of Rights ensures that each resident receives a standard of care that is free from abuse, isolation, and improper medical treatment.

***The Residents' Bill of Rights provides residents with the right to:***

- Privacy
- Accommodation of physical, mental, and psychosocial needs
- Communicate freely
- Be treated with dignity
- Be free from mistreatment, abuse, and neglect

FREE Case Evalu

Fill out this form fc
FREE Case Evaluati

Your Name*
Your Email*
Your Phone Number*
Tell us about your legal issue*

I'm not a robot

SUBMIT

Cases We Handle

Elder Abuse
Negligence
Injuries
Legal Action
Assisted Living
Resources
Women and Elder Abuse
Veterans Elder Abuse
Types of Nursing Home Emplc
Advocacy

Federal Nursing Home Reform Act (OBRA'87) Law and Legal Definition | USLegal, Inc. Page 1 of 9

USLEGAL (https://uslegal.com/)
USLEGAL.COM

Legal Help 

Search All of USLegal, Inc
Search

USLegal (https://uslegal.com/) >
Legal Definitions (https://definitions.uslegal.com/) >
F (https://definitions.uslegal.com/f/) >
Federal Nursing Home Reform Act (OBRA'87)

# Federal Nursing Home Reform Act (OBRA'87) Law and Legal Definition

Barasch McGarry Law Firm
Lawyers For The 9/11 Community
68 Cancers Linked to 9/11 Toxic Dust. Deadline Extended. Call Now - Free Consult
post911attorneys.com VIEW

Nursing Home Reform Act (OBRA'87) is a federal law that sets some standard of care and establishes certain rights for elderly persons in the U.S. The provisions of the Act are contained in Omnibus Budget Reconciliation Act of 1987 (OBRA'87). The Act requires the states and federal government to inspect nursing homes and to enforce standards by using a range of sanctions. Nursing homes are required by law to provide residents with regular evaluations, complete care plans, nursing services, social services, rehabilitation, pharmaceutical care, dietary services and a full-time social worker. Some of the rights of nursing home residents conferred under the law are:

1.to admit and discharge oneself.

https://definitions.uslegal.com/f/federal-nursing-home-reform-act-obra-87/ 8/9/2018

2.to be informed about and to control one's own medical care.

3.to choose physician and treatment.

4.to administer drugs and to see medical records.

5.to be free from any physical or chemical restraints.

6.to manage own financial matters.

7.to receive or refuse visitors and access to a private telephone.

## Legal Definition list

» Federal Nursing Home Reform Act (OBRA'87)
Federal Nuclear Operations Corps' Study (f/federal-nuclear-operations-corps-study/)
Federal Noxious Weed Act (f/federal-noxious-weed-act/)
Federal Natural Resource Management Agencies (f/federal-natural-resource-management-agencies/)
Federal National Mortgage Association [FNMA] (f/federal-national-mortgage-association-fnma/)
Federal Ocean Acidification Research and Monitoring Act (f/federal-ocean-acidification-research-and-monitoring-act/)
Federal Offense (f/federal-offense/)
Federal Office [Federal Elections] (f/federal-office-federal-elections/)
Federal Officeholder (f/federal-officeholder/)
Federal Official (f/federal-official/)
Federal Parcel (f/federal-parcel/)

## Related Legal Terms

21st Century Nanotechnology Research and Development Act of 2003 (2/21st-century-nanotechnology-research-and-development-act-of-2003/)
3-A Sanitary Standards and Accepted Practice (3/3-a-sanitary-standards-and-accepted-practice/)
30-Year Contract [Agriculture] (3/30-year-contract-agriculture/)

ors are appointed [illegible] vious two years, and [illegible] with the department [illegible] monitor shall have the [illegible] tor correction of the [illegible] gment, will give rise to [illegible] s present at a home at any [illegible] residents, or fraction thereof [illegible]

g an alleged wrongful [illegible] is not within the jurisdiction [illegible] ncludes a provision that [illegible] appeal in accordance w[illegible] provides for an appeal from [illegible] non pleas.[33]

ng home licensed by the [illegible] e violations, the court [illegible] strative hearing and [illegible] nce that the applicant [illegible] violations is not admi[illegible]

g home was made [illegible] f the Public Health Council [illegible] procedural due process [illegible] Ch 119, when the D[illegible] nal licensee. Furthermore [illegible] operation of the nursing [illegible] r a time in the continued [illegible]

2. Residents' Rights [§§ 110-132]

a. Rights [§§ 110-116]

Definitions

[illegible] in the statutes governing patients' rights:[36]

[illegible] means a home as defined in the statutes governing rest [illegible] nursing homes,[37] any facility or part of a facility not so [illegible] is authorized to provide extended care services under the [illegible] Social Security Act, or a county home or district home.[38]

[illegible] means a resident or a patient of a home.[39]

[illegible] trator," with respect to a home, means a nursing home [illegible] with respect to a facility or part of a facility which does [illegible] within the definition of home but is authorized to provide [illegible] care services, it means the administrator of the facility or part [illegible] and with respect to county or district homes, it means the [illegible] ident.[40]

[illegible] means an adult relative, friend, or guardian of a resident [illegible] interest in or responsibility for the resident's welfare.[41]

*[illegible]ation:* As an adult relative, friend, or guardian of a [illegible] home resident who had interest or responsibility in [illegible] resident's welfare, the husband of nursing home resident [illegible] as a "sponsor" under the statute affording certain [illegible] nursing home residents and, thus, had standing to [illegible] the nursing home and its vice president of nursing for [illegible] violations of his wife's rights.[42]

'or discussion of the [illegible] cedure Act, see O Jur 3d [illegible] Law §§ 57 et seq.

4. In re Lane Nursing Home [illegible] 3d 146 (C.P. 1976).

5. Adams v. Ohio Dep[illegible]

[illegible] 356 N.E.2d 324 (C.P.

[illegible] Health Council, gener- [illegible] Health and Sanitation

[illegible] 10 et seq.

[illegible] 10(A), referring to RC [illegible] ed in § 93.

[illegible] 0(A).

[illegible] 0(B).

40. RC § 3721.10(C).

As to the definition of "nursing home administrator," see § 134.

For discussion of county and district homes, see O Jur 3d, Public Welfare §§ 95-112.

41. RC § 3721.10(D).

42. Belinky v. Drake Center, Inc., 117 Ohio App. 3d 497, 690 N.E.2d 1302 (1st Dist.Hamilton County 1996), appeal not



09:42P
(+16143785919)
Mar 15, 2017 8:05
Ok, i will call u !
If they are ask u .
just said urs mr.
Wu friend !
Options
Back
01:02A
-16143785919) V
Mar 15, 2017 8:12
Because ur all day
there with mr wu
. so they will ask
u !
Options
i(+16143785919)
Mar 15, 2017 8:15
it's ok, I tell them
I took care of him
in virginia
Back
10:38P
-16143785919) V
Mar 15, 2017 8:17
Just said friend !
12:30A
6143785919) W
Mar 15, 2017 8:18
It's better!
Options
Back
exibit g
12:46A
16143785919) W
Mar 15, 2017 8:22
ok, but some
people already
know i'm from
virginia.
Options
Back
12:55A
Wu Kuei(61437859
Mar 15, 2017 8:27
don't worry.
everybody is nice
to me, there.
Options
Back

exhibit H

Outbox (130/384)
To : Keui
Spring is too long, no good. I come on jan. 15. By then my relatives should be back from florida.
Date : 12/19/2017
Options
Forward

Outbox (114/383)
To : Jen
With shis now
Date : 01/14/2018
1:36 pm
Options
Forward

Outbox (113/383)
To : Jen
Brought your dad some strawberry shortcake and mt dew. Going to shave him soon.
Date : 01/14/2018
Options
Forward

Outbox (110/383)
To : Keui
Im here with shis. He went to take a bath. Leaving at 4 today. Good to see you.
Date : 01/16/2018
11:33 am
Options
Forward

EXHIBIT I exhibit i

Outbox (362/384)
To : Jen
Unlock door please
Date : 07/26/2017
9:33 am
Options Forward

Outbox (340/384)
To : Jen
Open door please
Date : 08/01/2017
9:08 am

Outbox (310/384)
To : Jen
Open door please
Date : 08/10/2017
9:11 am

Outbox (289/384)
To : Jen
Im here door locked
Date : 08/22/2017
9:13 am

Outbox (260/384)
To : Jen
Open door please
Date : 09/02/2017
9:06 am
Options Forward

Outbox (243/384)
To : Jen
Open door please
Date : 09/07/2017
9:09 am
Options Forward





exhibit K

LAWriter® Ohio Laws and R

Route: Ohio Revised Code » Title [29] XXIX CRIMES - PROCEDURE » Chapter 29
DMINISTRATION

## 2921.03 Intimidation.

A) No person, knowingly and by force, by unlawful threat of harm to any person or prope
ecording, or otherwise using a materially false or fraudulent writing with malicious p
aith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or h
servant , party official, or witness in the discharge of the person's duty.

B) Whoever violates this section is guilty of intimidation, a felony of the third degree.

C) A person who violates this section is liable in a civil action to any person harmed by t
njury, death, or loss to person or property incurred as a result of the commission of the
easonable attorney's fees, court costs, and other expenses incurred as a result of prose
action commenced under this division. A civil action under this division is not the exclus
person who incurs injury, death, or loss to person or property as a result of a violation of

Effective Date: 11-06-1996.

# 2921.04 Intimidation of attorney, victim or witness in criminal case or delinquent child action proceeding.

(A) No person shall knowingly attempt to intimidate or hinder the victim of a crime or delinquent act in the filing or prosecution of criminal charges or a delinquent child action or proceeding, and no person shall knowingly attempt to intimidate a witness to a criminal or delinquent act by reason of the person being a witness to that act.

(B) No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any of the following persons:

(1) The victim of a crime or delinquent act in the filing or prosecution of criminal charges or a delinquent child action or proceeding;

(2) A witness to a criminal or delinquent act by reason of the person being a witness to that act;

(3) An attorney by reason of the attorney's involvement in any criminal or delinquent child action or proceeding .

(C) Division (A) of this section does not apply to any person who is attempting to resolve a dispute pertaining to the alleged commission of a criminal offense, either prior to or subsequent to the filing of a complaint, indictment, or information, by participating in the arbitration, mediation, compromise, settlement, or conciliation of that dispute pursuant to an authorization for arbitration, mediation, compromise, settlement, or conciliation of a dispute of that nature that is conferred by any of the following:

(1) A section of the Revised Code;

(2) The Rules of Criminal Procedure, the Rules of Superintendence for Municipal Courts and County Courts, the Rules of Superintendence for Courts of Common Pleas, or another rule adopted by the supreme court in accordance with section 5 of Article IV, Ohio Constitution;

(3) A local rule of court, including, but not limited to, a local rule of court that relates to alternative dispute resolution or other case management programs and that authorizes the referral of disputes pertaining to the alleged commission of certain types of criminal offenses to appropriate and available arbitration, mediation, compromise, settlement, or other conciliation programs;

(4) The order of a judge of a municipal court, county court, or court of common pleas.

(D) Whoever violates this section is guilty of intimidation of an attorney, victim, or witness in a criminal case. A violation of division (A) of this section is a misdemeanor of the first degree. A violation of division (B) of this section is a felony of the third degree.

VOID VOID VOID

Primary Reg. Dist. No. 2512 Ohio Department of Health - Vital Statistics State File No. 2018055192

Registrar's No. 2018009482 CERTIFICATE OF DEATH

SHIB KIN WU — MALE — SEPTEMBER 04, 2018

TAIWAN

OHIO — DELAWARE — POWELL

7047 DEER VALLEY CROSSING 43065

DIVORCED (AND NOT REMARRIED)

9TH THRU 12TH GRADE; NO DIPLOMA — NO — CHINESE

ZHEN JI WU — LAI RENMEI

KEVIN WU — SON — 7047 DEER VALLEY CROSSING POWELL, OHIO 43065

NURSING HOME/LONG TERM CARE FACILITY

HEARTLAND OF DUBLIN — DUBLIN, OH 43016 — FRANKLIN

RONALD L. MCDONALD — 005074

REMOVAL FROM STATE - WESTEND CEMETERY, WYTHEVILLE — RUTHERFORD FUNERAL HOME 450 W OLENTANGY ST POWELL, OH 43065

Local Registrar: Sandra Taylor — SEP 10 2018

23:57 — 9-4-18 — NO

MD — 35.052188

DONALD OWEN MACK, 2231 N. HIGH ST, COLUMBUS, OH 43201

Parkinson's Disease

VOID

Sandra Taylor, Franklin County Registrar

SEP 10 2018

exhibit L

w death certificate



exhibit M

Friday — May 12

Today I came at noon. Elvis was sleeping. I let him sleep & did other chores, etc.... Then gave him a bath & lotion & helped him get dressed. He went & ate while I changed his bed & did laundry. Cleaned the bathtub, also. After Elvis ate, I shaved him. Then washed his feet & put lotion on them. After that he laid down awhile. I read notes from Kevin & the rehab.

Friday – May 19

I got here at noon. Shis took a shower after sleeping in for a little bit. Changed trash & cleaned the potty chair. Took his pills around 12:30 p.m., & ate his lunch at 12:50 p.m. I vacuumed the floor. Brought a clean Bathrobe for Shis (New & freshly washed) for after his shower. (He always says he is cold.) I shaved him & put a little lotion on his face. Filled up the pill dispenser. Shis didn't feel like exercising today.

Wednesday – May 31,

I got here a little early today. Talked to jen about the medicine. Also fixed medicine in the new container I bought. jen will give to him when I'm not here. Gave Shis a shower & lotion. Vacuumed the floor & took out the trash. He took lunch meds at 12:20 pm. Then I shaved him & gave him a foot massage. He ate snacks after his shave. Shis seems to be walking much better today. I'm happy about that.

Monday — June 12

I got here at 11:55 a.m. A little early. Gave Shis a shower & lotion & clean clothes. Changed the bed & put a clean pad on it. Doing laundry today. Vacuumed & changed the trash. Shaved Shis & put lotion on his face. He is sleeping in the chair, will massage his feet. Let him take a nap in the ~~bed~~ bed. Shis took his lunch pills at 2:45 p.m. Ate lunch from the restaurant at 3p.m. I did the pills for the week. ☆ One Bottle of pills had the wrong pills in the top & cotton between them & the right pills in the bottom ☆ weird
Brought a Brand New Black fan for Shis room. It's too hot in here! Shis has been relaxed & napping this afternoon, he is enjoying having the fan. Also sleeping better with it. Shis had his evening pills at 5:55. He ate some yogurt at 6:15 p.m.

Monday - June 19,

I got here at 11:45 a.m. A little early. Mr Wu (Shis) had his head down in the Rice. Was asleep again. He went to the toilet, but had no success with the poo poo deal. Gave him a shower. Treated his sores with betadine & poly ointment. Lotion to his body. Clean clothes. I vacuumed the floor. Took out the trash. Took BP was 108/62 in a reclined position. Am doing medicine today & refilling it. Took lunch pills at 1:40 p.m. He is eating potato salad and crackers. No laundry today. No Shave. Gave Shis an mini enema he is trying to poo. Did a little walking before I left.

Sunday - June 25

I got here about 11:45 a.m. Shis was eating. I vacuumed & emptied the potty. Am doing laundry today. Gave Shis a shower & lotion & ointment to sores. Lotion to body & clean clothes & diaper. Changed the bed today. Washed dishes. Refilled the medication tray. Massaged his feet. He took his lunch pills at 1:30pm. Bp 130/86. Shis is walking pretty good, now. Shis is eating a snack at 2pm. Stayed a little over today, cause Shis was eating.

Friday — June 30

Shis was a little restless last night. Called Kuei at 2 am. She called me. Apparently, Shis couldn't wake me up. I told her he kept me awake at night. Slept ok the rest of the night, but very sleepy this morning. Was trying to walk with his eyes closed. Finally got him to pee & to the shower & dressed. Lotion to his body & ointments to sores (which are looking better) He took his pills around 9 a.m. Ate at 9:20 a.m. Had egg & Apple cin oatmeal 7 oz. Got Shis settled back at the restaurant & checked out of the motel. Clean Clothes AGAIN! YA!! He took his lunch pills at 12:55 p.m. Is eating a good lunch, too! I washed up the dirty clothes. Vacuumed the floors and emptied the trash. Shis still kind of has a cough. Coughed up alot of mucous (clear) at 3:30 p.m. Took BP. It was 110/70 massaged his feet some. Refilled medication tray. Evening pills at 5:55 p.m. Shis supper after that. ~~Back to bed at 7pm.~~

July 6 – Thursday

I got here at 9:25 a.m. Took BP 136/78, at 9:40 a.m. Shis says he did not sleep good last night. Time he took meds this morning is unknown? Shis ate his breakfast around 10 a.m. I fixed the pills this morning for the week. After breakfast, Shis took a shower & had lotion, ointments & clean clothes. Then laid down & took a nap. Got Back up & took lunch pills around 12 p.m. Doing laundry today. Shis ate his lunch at 12:20 p.m. Vacumed & took out the trash. Cleaned out leftover food from the frig.

August 4, Friday

I got here at 9:10 or so. Shis sitting with walker in the window chair. He seem fine. Keni sent a text & said he had to poo. I take him to toilet, no Results. But he said he poo yesterday. I gave him a shower early & then took him to take morning pills around 9:30 a.m. Do laundry this morning. ~~Also refilled~~ medications. Shis ate a good breakfast & then laid down for awhile. Got up & took lunch pills at 12:30p.m. Had a good nap. Also drank a banana milkshake. Vacumed earlier & Cleaned laundryroom sink. 100/64 BP.

August 29, Tuesday

I got here around 9:10 a.m. S his in bed. Let him pee & took him to shower. But first he took his (morning pills) at 9:15 a.m. Got out of the shower & had clean clothes & lotion. Then he ate some french toast I made & scrambled eggs Jen brought. Also a little banana. He laid back down after that. I bleached the potty chair basin. No laundry today. S his took a 2 hour nap & then got up to pee. I was vacuuming. He took (lunch pills) at (12:10 p.m). Ate around 12:30 p.m. I made fresh curry ck & noodles for him & Jen brought green beans & rice. He also had leftover eggplant w/ garlic. Trimmed his fingernails (R hand) while he was waiting to eat. I worked on the medications (filling them up) Laid back down after lunch.

Sept 15, Friday

I got here around 9:15 a.m. Gave Shis his morning pills. He was sitting in the chair & I took him to the shower & then gave him fresh diaper & clean clothes & itch lotion. He was sleepy during breakfast & fell asleep on the d[illegible] when I went to empty the potty chair. Luckily I had the pillow in the chair & he didn't fall out! He ate scram egg I fixed him, sausage & Blueberry waffles. Apple juice, also. Laid back down at 11:20 a.m. Doing a small load of clothes. Vacuumed, then got Shis up & took him outside. Rode around awhile, took some pictures, also & came back. Got back & Shis took his lunch pills at 12:45 p.m. or so. Ate strawberry shortcake for lunch & Rice with ck & vegetables. Very quiet today. Did medications in the box. BP 100/60 1:45

exibit N

11:12
(+16143785919)
Jul 03, 2017 1:41
the meal and
vitamin D3 is
important. Thank
u !
Options
Back

11:13
5919) Wu Kuei(+
Jul 03, 2017 1:55 P
Fish oil , is good
for skin and help
heart , asking jen
going buy some .
Options
Back

11:16
9) Wu Kuei(+161
Jul 14, 2017 11:50
sure he have a
D3 and B 12 , he
need practice
saying something
Options
Back



exhibit N

Friday — May 26

I got here around 12 p.m. Gave Shis a shower. Took pills (lunch-dose) before his shower. Full body lotion. Emptied urine. Strong smell but clear. Did laundry. Shis ate around 12:30 or so. Had sweet snacks also. Did extra vacuuming today. (Steps to downstairs) with Dyson vacuum (cordless). Also regular vacuuming. Cleaned glasses. Shis was tired & laid down at 1:15 p.m. I massaged his feet & hands. No Shave today, or exercise. Maybe tomorrow. Shis was walking ok, today. Sprayed out the shower & cleaned the toilet with spray & comet. Filled up the pill dispenser of the Carbidopa. Emptied the trash.

24/60/40

Saturday – May 27

I got here at 5p.m. Shis was on his knees & had 'slid' on the floor. He seemed ok, though. I picked him up & he seemed to walk ok, but reluctant to stand all the way up, at first. Gave him a shower & lotion also. Put on clean clothes & shaved him. Shis seemed disoriented & had trouble comprehending things. Also tremors to mouth & hand. Took evening meds before 6p.m. gave him provastatin because I was unsure if he took it at lunch??? So because he had symptoms of not taking it, I gave it to him anyway. Room very hot when I arrived. Heat was turned on??? I vacuumed the floor & took out the trash. Seemed to want to lean over in the chair, so I propped him up with his pillow. Jen asked me to inventory the pills & count them to see what was missing each day I work. Shis ate pizza & fruit for supper.

Sept 16 - Saturday

Today I got here early, but got inside around 9:10 am Took Shis to shower, he was really wet with pee. Then got him fresh clothes, itch lotion & diaper. He took morning pills at 9:40 a.m. forgot to give before shower. Made up several new foods, fresh, for him to eat, the next few days. For breakfast he ate: ~~ck~~ fried rice, scram eggs & ham & french toast sticks. He took suppositories & tried to have a poo poo after he ate. Running behind today. Shis laid down at 10:50 a.m. Slept till 12:20 p.m. 1½ hrs. Took him outside till almost 1 p.m. He took his ~~[illegible]~~ lunch pills at 12:55 p.m. Ate lunch at ~~[illegible]~~ 1:15 p.m.

BP 100/70 1:55 p.m.

July 10, Monday

I got here around 11 a.m. It was a busy morning. Shis was in the bed (sort of) ½ way in or out. I helped him to the bathroom & gave him an ^mini enema. He had a poo, then he took a shower. While he was doing (his business) I rearranged the furniture in the bedroom so the microwave could plug in the wall. After shower Shis had a fresh diaper & clean clothes & lotion. Then he laid down on the bed & took a nap. I scrubbed the carpets. Also vacuumed & took out the trash. 130/76 BP 1:05 p.m. Shis took his lunch pills at 1pm or so. No shave today, No laundry. Shis ate some rice ^w meat & cookies. Then laid down awhile. Massaged his feet. Did tomody Exercises in the bed. Shis ate shrimp + vege at 3:40 p.m. He ate a little, but didn't like that well. So I ordered some pizza. He ate some at 4:45 p.m. Took ecotrin early. Took the rest of his evening meds at 6:30 p.m. w cool apple juice from the frig.

exhibit-O

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850

**Office of Strategic Operations and Regulatory Affairs/Freedom of Information Group**
Refer to: Control Number 020120197021 and PIN MSDP

5/21/2019

Jackie Giebell
P.O Box 76
Whytheville, VA 24382

Dear Ms. Giebell,

This letter is in response to your Freedom of Information Act (5 U.S.C. §552) request of 2/1/2019, which you sent to the Centers for Medicare & Medicaid Services. Within your correspondence, you requested documents relating to Ohio investigations 00099902, 00099371 and 00100358.

After careful review of the documents submitted to me, a total of twenty-one (21) pages, I have determined to release them to you, as enclosed. Nineteen (19) pages are released to you in their entirety. However, I am denying you access to portions of two (2) pages pursuant to Exemption 6 (5 U.S.C. §552(b)(6)) and Exemption 7 (5 U.S.C. §552(b)(7)(C)) of the FOIA.

Exemption 6 of the FOIA permits a Federal agency to withhold information contained in personnel and medical files and similar files the disclosure of which would "constitute a clearly unwarranted invasion of personal privacy." I have weighed the public interest in disclosure (which the Supreme Court has held to be limited in this context to the public interest that would be served by shedding light in the agency's performance of its statutory duties) against the harm to the privacy of the individuals identified in these records and have concluded that the privacy interest of the subject individuals outweighs the public interest in disclosure in this particular matter.

Exemption (b)(7)(C) protects from disclosure from disclosure "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of privacy."

If you believe that the information withheld should not be exempt from disclosure, or this response constitutes an adverse determination, you may appeal. By filing an appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider your request and the agency's decision.

| Date and Time | Source and Documentation |
|---|---|
| | facility does not use restraints or alarms. LPN #235 stated that fall interventions are communicated to the staff through the computer task and care plan functions |
| | Review of Resident #5's medical record revealed the resident was admitted to the facility on 08/25/18 with diagnosis that include but are not limited to Parkinson's, dementia, cerebral infarction, hypertension, atherosclerotic heart disease, type 2 diabetes mellitus, dysarthria, weakness, and seizures.<br>Resident was discharged to the facility for therapy.<br>Review of admission general progress note revealed the resident was alert and oriented x3 with confusion and forgetfulness. Resident was oriented to the room and the call light. Medications were verified with the nurse practitioner and the resident's skin assessment revealed the resident had multiple small scratches and scattered bruises on the skin a skin tear on the right arm and redness on the bottom. The resident is noted to need assist with bed mobility.<br>Progress notes revealed there was a care conference on 08/27/18 with the patient therapies, RN and social services. No concerns noted in the care conference note.<br><br>The resident is noted on 08/28/18 to be alert and able to communicate needs, is a one assist with Activities of daily living mobility and transfers.<br>Progress note revealed body audit on 08/29/18 per wound team interventions in place md and family notifications mad.<br><br>Progress notes revealed on 08/31/18 the resident was found at 6:45 A.M. lying in front of his bed with blood under his head. Patient was assessed, and vitals were sable the patient complained of pain in the left shoulder. Family and nurse practitioner were notified and EMT was called and the resident was transferred to the hospital.<br><br>Review of care plan revealed the resident used a wheel chair and a walker for his mobility needs resident had care plan for fall risk that included encourage to transfer and change position slowly, have items in reach, provide assist as needed reinforce need to call for assist PT, OT as ordered. Has an alteration in skin integrity care plan to observe with adl's and off load as able. |
| | During multiple observations of the facility during the day of the facility no beds were noted to be in the high position Residents were noted to have access to the call light and staff were available to assist the resident with their needs. |
| Start Here | Review of Resident # 10 medical record revealed the resident was admitted to the facility on 01/13/17 with diagnosis that include but are not limited to Parkinson's disease, hypertension, hyperlipidemia, weakness and dysphagia. The resident is noted to be a do not resuscitate comfort care and was receiving hospice benefit at the time of his death on 09/05/18. Resident medications included: |

FORM CMS-807 (12/06)

| Date and Time | Source and Documentation |
|---|---|
| | Aspirin 81mg daily, biscodyl 10 mg suppository as needed. Sinemet 25-250 two tablets in the morning and 1 tablet in the evening, docusate 100mg daily. fish oil 1,000mg daily, MiraLAX 17gm daily as needed. pravastatin 20 mg daily at bedtime, Tylenol 325mg two tablets every 8 hours as needed, vitamin B-12 500 mcg daily, vitamin C 500 mg daily, vitamin D3 5,000 units daily.<br><br>Review of the hospice assessment dated 08/05/18 revealed the resident was alert and oriented to person and place with progressive neurologic disease process, end stage Parkinson's, the resident was noted to be require assistance form care givers for all Activities of daily living, the assessment indicates the resident has increased weakness, decreased function, decreased cognitive status, decreased skin integrity, increased need for services. The resident is noted to fall asleep in the hospice nurses' presence, and to have had a recent decline, the family had reported he had on and off days. The note stated the resident has a 15-year history of Parkinson's now with functional decline and generalized weakness.<br><br>Review of progress note from 08/22/18 revealed the resident had a fall in his room trying get up on his own it is documented the resident was close to nurses station, the staff had just been in with the resident and the resident was then found on the floor, the resident was assessed per standard, and sent to the ER for stitches. No deficient practice.<br><br>Skin documented on 08/13/18 as discoloration from normal aging process form nurse practitioner. 08/14/18 and resident stated discolored area to wrist has been there since he was young. Only area noted. 08/15/16 no new skin areas, 08/16/18, 08/22/18, 08/29/18, no new areas noted, 08/30/18 open area to right buttock 1x1 z guard. Resident was off hospice after return form hospital and was put back on hospice on 09/02/18 was actively dying on 09/03/18 and comfort measures from staff are charted all throughout out chart resident passes away on 09/04/18 at 11:57 P.M. family was the bedside.<br><br>Review of Minimum data set sig change dated 08/06/18 revealed the resident had a bims was not assessed, required extensive assist for all daily cares, the resident has had falls since admission, has less than 6 months life expectancy, is at risk for pressure ulcer but has no pressure ulcer, had no other skin alterations noted, is receiving hospice services.<br><br>The resident s medicine regime was reviewed by a pharmacist on 08/16/18 and found to have no irregularities. and reviewed monthly. |
| | Review of Resident # 2's medical record revealed the resident was admitted to the facility on 05/05/17 with diagnosis that include but are not limited to abdominal pain, bipolar disorder, acute kidney failure, type 2 diabetes, hyperlipidemia, disease of thymus, constipation, irritable bowel syndrome, and unspecified open wound of abdominal wall. |

(Carbadopa) ← [handwritten] ; [handwritten, illegible] ; see exhibit 4 ↗ [handwritten] ; incomplete? [handwritten]


ATTENTION : OFFICER TRAVES

COUNTER COMPLAINT FOR TELEPHONE HARASSMENT CHARGE, made by kuei wu and kevin wu

Officer Traves,

I do not know for sure if Mr Wu, ( shis-kin) has his phone or not. But I tried to call him YESTERDAY,(before the complaint was filed) around 12:45 pm, and did not get him. But didn't realize until late last night, that Mr. Wu had tried to call me back at 12:51 pm, yesterday. It showed up as a missed call on my phone. Also I have 2 texts, 1 from Mrs. Wu, and 1 from my boss, Jen wu, in Virginia, giving me permission to call Mr. Wu.

That is in addition to the permission from the corporate office of the rehab center, to make calls and have visits with Mr. Wu. And THE NURSING HOME REFORM ACT OF 1987, that states that patients have a right to receive calls from those that they want to talk to. The missed call from Mr. Wu, shows that he wants to talk to me. Therefore anyone trying to restrict him or myself from communicating, is violating a federal law.

The next part of this, is to document the issues of the last 3 and a half months. I have been going through this phone problem since the end of april of this year. Mr. Wu always kept his phone in his pocket, where it could be easily reached, and usually answered the phone within 1 or 2 calls. The end of april, I was told he dropped his phone in the shower, and that it wasn't working correctly. One Sunday morning, I called Mr. Wu, and he didn't answer, yet called me back. When I answered, someone hung up the phone and then Mrs. Wu called me back, and said something like don't call Mr. Wu early. This was at 9 am when I usually called and got an answer from him. At first, I thought that Mrs. Wu had the phone, but as the day wore on, I realized that Mr. Wu had called me back, and Mrs. Wu had took the phone away from him! Mrs. Wu told me that she was ordering a new phone, and that the voice wasn't working on his phone. Yet when I called, it worked ok. I found out from a 3rd party that when I called the room phone, the nurses took Mr. Wu the phone, and Mrs. Wu took it away from him. So I sent the same 3rd party into the room to answer it for Mr. Wu and hand him the phone.

After that, I would call Mr. Wu and hear Mrs. Wu yelling at him in the background. The few times that Mrs. Wu did let me talk to Mr. Wu, it was at mealtime and he didn't like to talk then, he wanted to eat. So I called at different times.

After Mrs. Wu tried to get me out of the nursing home, she agreed that I could call Mr. Wu, yet every phone number I called him with, ended up blocked. At first I thought Mr. Wu's phone was turned off, until I called his number, with a different phone, and this phone went through. Then I realized what happened. I constantly had to change my cell phone no, and use multiple phones, to be able to call Mr. Wu, which I had permission to do anyway.

More recently, I had noticed that most of the time, I have to call multiple times to get Mr. Wu. Sometimes I was able to get him at 9 am. One time a nurse helped me answer the phone at 10:15am. Another time a nurse helped me talk to him at 11am. Another time I got him around 1 pm. And even at 1:30 pm, and also 2 pm. So these were the different times I tried to call him. I also remembered that a

nurse brought Mr. Wu's evening medicine at 4:20 p.m. And another time, I got him a lot was 6 pm. The best time of the day to get Mr. Wu was around 1 pm and 6pm, but each day was different. And because I didn't know Mr Wu's schedule, it was hard to know exactly when to call. And I was calling at different times hoping to catch a nurse to help me answer his phone, also.

There were times that Mrs. Wu seemed to be controlling his phone, and Mr. Wu seemed very anxious to talk to me when I finally got him. (like at 6pm) Because of this, I couldn't even be sure that Mr. Wu had access to his phone at all. That's why I called the room phone. Because, I thought if Mr. Wu didn't have his cell-phone, maybe I could get a nurse to answer and help me. Also one time it seemed to help Mr. Wu to answer the phone. He heard the room phone ringing, then I call his cell-phone and he has time to get it and put it on his chest, so when I call his cell phone is there and he can answer it quickly.

At first the nurses were helping me, but I heard Mrs. Wu yelling at them, so they wouldn't help me anymore. Mrs Wu didn't like me calling Mr.Wu every day. So she would let me talk to Mr. Wu, then I heard her in the background trying to tell Mr. Wu to tell me stuff like not to call everyday, etc..

Mr. Wu never said stuff like that to me when Mrs. Wu wasn't there. And Mr. Wu had an afraid sound in his tone, and was stammering like he was under duress when he was making the statements.

Recently, Mr Wu has even had to 'struggle' with people to answer his phone. Last Wednesday, when he answered the phone, I heard him 'cry out' then there was a silence, and he said 'hey' as normal, but was out of breath. I heard voices in the background, so someone was trying to get his phone and Mr. Wu had to struggle to keep them from getting it. This also happened the week before, when I heard a similar disturbance.

I am NOT harassing Mr. Wu. It is quite obvious that Mr. Wu wants to talk to me.

Mrs. Wu is harassing me. I have heard her yelling at the nurses who have helped me answer the phone. She has taken the phone away from Mr. Wu when he calls me, she has blocked my phones , when I had permission to call him. And is now complaining about how many times I have to call him a day, when the reason I have to call so many times is because of problems that she created.

The law clearly states that it is illegal for someone to cause a problem for someone, then turn around and use that against them in a legal complaint. This is what the law calls ABUSE OF PROCESS.

I think this complaint should be dropped quickly, and that Mrs Wu should comply with the FEDERAL LAW, as previously mentioned.

Sandra A. Walling NOTARY PUBLIC COMMONWEALTH OF VIRGINIA

This document was signed in my presence on 8-7-18.

Sandra A. Walling

Notary

Sincerely,

Jacqueline Giebell

Jacqueline Giebell





Exhibit

officer Traves superior

Dear Sgt. Gallagher,

On Monday, Aug. 6, around 4 pm, I was contacted by officer Traves about a complaint that was made against me for telephone harassment by keui wu, and kevin wu, regarding Mr. Shis Wu who is in the Heartland of Dublin nursing home facility.

I am the former caregiver of Mr. Shis Wu, and have recently reported the abuse of 'said patient'. If you would like the details of such, you can contact Sgt. Bill Krayer, who is looking into it. And a complaint has been filed with the Ohio health, as well.

Officer Traves said he was giving me a 'warning' not to call Mr. Wu, and said if I did he would file the Telecommunications Harassment charge against me. But officer Traves said that Mr. Wu didn't even have his phone, yet said I was harassing him.

I was given contact rights with Mr. Wu by a corporate representative of the Heartland of Dublin Facility. This would include permission to visit Mr. Wu, and also up until this complaint was filed, phone calls.

Upon examining the Telecommunications Harassment Statute, I observed that no. 5 of the 'said statute', says that a person can get in trouble if they call someone and have been repeatedly told NOT to do so by someone on the 'premises'.

The word 'Premises' in this case would refer to the Nursing Home, because that's where Mr. Wu is located at. It is also where one of the 'said telephones' in the complaint, is located. (landline room phone)

I have a problem with this, because in my case, it is the EXACT OPPOSITE. I have been told REPEATEDLY by the nurses at the Heartland of Dublin facility, 'the said premises', that I COULD CALL Mr. Wu's phone, and the nursing home room phone, as well. So why is this complaint filed against me? It is WITHOUT merit, and I am not in violation of ANY of the other sections mentioned in the statute.

The people who made the complaint, took Mr. Wu's phone from him, and are violating a federal law over Nursing Homes (see attached) that guarantees Mr. Wu the right to have phone communications. In addition to this, they are also violating myself and Mr. Wu's 1st amendment rights to freedom of speech, because in our case, no one EVER repeatedly said not to call, at the 'said premises'.

I have been communicating on the telephone with Mr. Wu for months. And also talked to him from May 17 to July 20, everyday without missing any days.

It is my recommendation/request that this matter be immediately resolved and rescinded, and that my contact rights with Mr. Wu be completely restored.

Thank you,

Jacqueline Giebell

Jacqueline Giebell

This document was signed in my presence on 8-10-18.

Sandra A. Walling

Notary

Reg# 176206

SANDRA A. WALLING NOTARY PUBLIC COMMONWEALTH OF VIRGINIA

exhibit Q

DISCOVER EFFECTIVE STRATEGIES TO
REDUCE AND MANAGE PHYSICIAN BURNOUT
TODAY WHILE PREPARING FOR THE FUTURE.
HURON

MENU

Home > Providers

March 12, 2018 01:00 AM

# Justice Department declines to intervene in HCR ManorCare hospice lawsuit

TARA BANNOW  

TWEET SHARE SHARE EMAIL

The U.S. Justice Department has declined to intervene in four False Claims Act lawsuits against HCR ManorCare, alleging the provider admitted patients to hospice care who were not eligible for the service.

A group of former employees of HCR ManorCare's Heartland Hospice, accused the hospice of running a scheme in which it falsified patients' life expectancies so that they qualified for hospice reimbursement under Medicare Part A, and kept them on

the program after their medical conditions had stabilized rather than discharging them as required under Medicare rules. They alleged Heartland employees were fired if they did not admit a certain number of new hospice patients.

The Justice Department conducted its own investigation into the whistle-blowers' allegations before declining to intervene. The agency declined to comment on the decision.

The plaintiffs in the case can still move forward with their complaints, which were consolidated in U.S. District Court in Toledo, Ohio. The government will still receive updates on the case and could still become involved in the future, according to court documents.

Other hospice providers haven't had the same outcome. In January 2009, the Justice Department reached a $24.7 million False Claims Act settlement with Birmingham, Ala.-based SouthernCare Hospice stemming from a lawsuit accusing the provider of seeking reimbursement for patients treated at its hospice facilities that did not qualify for Medicare's hospice benefit.

The Justice Department late last year backed out of a similar case it brought in 2015 against HCR ManorCare's skilled-nursing operation. The lawsuit accused the company of fraudulently overbilling Medicare for millions of dollars. That happened after a federal judge excoriated the government for its handling of the case and ruled a witness lacked credibility.

HCR ManorCare recently announced it is filing for bankruptcy and plans to shift ownership and leadership to its landlord.

*Letter – to the – Editor*

**Send us a letter**
**Have an opinion about this story? Click here to submit a Letter to the Editor, and we may publish it in print.**

RECOMMENDED FOR YOU

**COVID-19 heroes must jump through hoops for workers' comp**

exhibit S

se or occupancy of state
property under Division
ing or exhibiting of any
vision of Wildlife) or RC
nting and trapping on the

ırrant or other process is
ıg the dumping of refuse
the state when violation
l, leased, or controlled by
ions of the Revised Code
y weapons, or dangerous

ee.[40]

12, 1413]

liscovery, apprehension
her for a crime, or to aid
of a crime, or with
ı, prosecution, adjudica
child for an act that
ı assist a child to perm

from the commission of an act that, if committed by an adult, would be a crime, may:

- harbor or conceal such other person or child[41]
- provide such other person or child with money, transportation, a weapon, a disguise, or other means of avoiding discovery or apprehension[42]
- warn such other person of impending discovery or apprehension[43]
- destroy or conceal physical evidence of the crime or induce any person to withhold testimony or information or to elude legal process summoning him to testify or supply evidence[44]
- communicate false information to any person[45]

The commission of any of the proscribed acts with the requisite intent constitutes obstructing justice.[46] The seriousness of the violation depends on the underlying crime or act. If the crime committed by the person aided is a misdemeanor, or if the act committed by the child aided would be a misdemeanor if committed by an adult, obstructing justice is a misdemeanor of the same degree as the crime committed by the person aided or a misdemeanor of the same degree that the act committed by the child aided would be if committed by an adult.[47] Except as otherwise provided, if the crime committed by the person aided is a felony, or if the act committed by the child aided would be a felony if committed by an adult, obstructing justice is a fifth-degree felony.[48] If the crime committed by the person aided is aggravated murder, murder, or a first- or second-degree felony, or if the act committed by the child aided would be one of those offenses that, if committed by an adult and if the offender knows or has reason to believe that the crime committed by the person aided is one of those offenses, or that the act

41. RC § 2921.32(A)(1).

42. RC § 2921.32(A)(2).

43. RC § 2921.32(A)(3).

44. RC § 2921.32(A)(4).

45. RC § 2921.32(A)(5).

As to circumstances under which a person is deemed to act purposely, see § 631.

46. RC § 2921.32(B)(1).

47. RC § 2921.32(B)(2).

48. RC § 2921.32(B)(3).

Exhibit I

Notes for Mon Dec 5, Wed Dec 7 →

Mr. Woo had fallen when I arrived at noon on Monday. Had symptoms of stroke. Dragging (R) leg & slobbering. Some weak.

Had found a pill he had not taken on thurs or Sat night under his table where he eats. Unsure if the symptoms of distress were caused by the missed pill or not.

Urine was a decent amount but was darker than usual. I laid down before I left for awhile.

Wed Dec 7

Mr. Woo was much more [illegible] today. Was walking with ease & very good. Did not hesitate or drag leg. Seemed anxious to move & exercise.

Noticed urine was alot less than on Monday, but color was better.

Needs to drink more & clear water. Encouraging him.

Fri — Dec 8

Arrived at noon. Mr. Woo's bags were packed. He had got into it w Jen. Mr. Woo peed the bed. Jen had stripped the bed. Mr. Woo refused his bath for awhile, then finally took it. [illegible] [illegible] [illegible] w honey at 2 pm. Cleaned tub & toilet seat. Cleaned [illegible] in tub. Washed comforter. Also other clothes. Played basketball etc. [illegible] urine output. Did not empty potty [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] decent,

December 10, Sat night

I worked 7 hrs. New schedule. Mr. Wu took a bath & got dressed. Pizza ... Had a pie, ... to change pants, etc. ... washable bed pads. Got some stains out of carpet.

December 12, Mon.

I arrived at noon. Mr. Wu was in bed. [illegible] Today. Needed some assistance with walking. I shaved him today, he was relaxed & enjoyed it. Laid down before I left. He had a skinned place on his (L) shoulder. I put betadine on (tried to). He did not want me to, it was hurting him.

Dec. 14 - Wed

Mr. Wu was up eating lunch. Seemed stronger. Bath & shave & lotion. Did laundry. Changed bed. Jen brought us some pie for a snack around 2 p.m. Did not exercise as much as usual. Took a nap in bed, when I left. Gave him foot massage. Potty was already empty. Bedpads working good.

3HRS

Dec 16 - Fri

Mr. Wu had lunch & 3 pizza slices. Gave him a shower & vacuum. Shaved him & did the laundry. Played racketball. Laid down before I left. Gave him foot massage & emptied potty. Urine was decent amount & color. Cleaned tub. Took out trash

Came ~~&~~ [illegible] Emptied Mr. Wu's potty chair. Mr. Wu had company, Jeri's Brother. Gave Mr. Woo a bath & vacuumed the floor. Did laundry. Betadine to sores. Shaved him & gave him a foot massage. Did not change the bed today. Looked ok. Helped Mr. Woo ~~to the~~ car & Jeri's brother Kevin took him out shopping.

December [illegible] [illegible]

Came & emptied potty. Gave Mr. Wu a bath, Changed bed. Vacuumed & showered Mr. Woo. Played racketball. Massaged his feet. Read about fruit in the food book. Sore on left shoulder is looking better.

December ~~19~~, ~~Wednesday~~ Monday

I came at 11:50 a.m. Mr. Woo took a shower & lotion. Vacuumed. Emptied potty & took out the trash. Mr. Wu laid down before I left & I read to him from the food guy book. Stayed an extra hour ~~today~~.

December ~~[illegible]~~ Sat. night xmas eve

Mr. Wu was halfway in/out of the bed when I arrived. Ankle looked strained. Had to pull him up from the way he was leaning on the bed. Ching said he was up before, at 4:30 p.m. or so. Had a bruise & blood blister on underside of foot. Changed bed again. Mr. Wu had peed himself. Gave him shower & vacuumed. Did not play racketball

[illegible] Monday

I arrived early & stayed 2 hours. Mr Wu was in bed. Gave him a shower & lotion. Cleaned his potty chair, did laundry. Cleaned tub & shower & put comet in the ~~[illegible]~~ toilet & scrubbed. Lotion also to feet. Cut up his meat for him & gave him Chinese cake & peaches. Read to him in the food book. Played racketball a little.

Dec. 28 — Wed,

I arrived at 11:50 a.m. Stayed 3 hours today. Filed his ~~[illegible]~~ toenails with an emery board. Also shaved him. Gave him a shower, first & changed the bed. Brought him a meal from downstairs at 3 p.m. Read to him in food book, played ball. Gave him [illegible]

[illegible]

Got to [illegible] early. Mr. Wu was sitting in the Black chair ~~[illegible]~~. Emptied potty & gave him a shower. Did laundry & vacuum & shaved him. Mr Wu did not play racketball, first time he had [illegible] [illegible], took a nap. Slept awhile & I read to him the food book, and massaged his legs & feet w/ lotion. He got up & ate cookies & food in [illegible]. I heated [illegible] drank Mt. Dew.

Urine output looked dark / cloudy but good amount.

Dec 31, Sat. New Years Eve /

I got there 3 min late. 5 min early last time. Mr. Wu was lying in bed & heat was off. Room was chilly & he had his coat on. Turned up heat & gave him a hot bath. Vacuumed. Jen brought us a donut. Mr Wu & me played racketball. Mr. Wu went back to bed & I gave him a foot massage.

Mon, Jan 2

Today I worked 11:30 to 1:30 p.m. Mr. Wu seemed weak in the legs (again) this time other leg as well (slightly). Cleaned toilet [illegible]. Shaved him & changed his bed. He had [illegible] here I left. Took a shower & played with the balloon.

Wed, Jan 4

Mr Wu is going to leave & go to Ohio soon. I came at noon & washed his clothes & gave him a shower. Then I worked some more on his toenails & a little on his fingernails. Gave him a snack of Jello & marshmallow cake. Read in the book & gave him foot massage also. Shaved him & played a little racketball. Both legs weak today.

# exhibit T

Friday — May 12

Today I came at noon. Chris was sleeping. I let him sleep & did other chores, etc.... Then gave him a bath & lotion & helped him get dressed. He went & ate while I changed his bed & did laundry. Cleaned the bathtub, also. After Chris ate, I shaved him. Then washed his feet & put lotion on them. After that he laid down awhile. I read notes from Kevin & the rehab.

Saturday – May 13

Today I came at 5 p.m. Helped Skis take a bath. (Shower) He took his evening pills at 5:45 p.m. Put PJ'S & fresh shirt & diaper on him. Massaged his feet with lotion. He ate around 6 p.m. Had alot of trouble walking at first. Did laundry & put down fresh bed pad. Vacuumed the floor. Cleaned picture frames. Cleaned shower.

Monday – May 15

I got here at noon. Gave Shis a shower. Also clean clothes. Lotion to body & sha Foot massage at 1:15 p.m. Took his pills (lunch-time) at 1 p.m. Fed him yogurt at 1:20 p.m. Vacuumed & did laundry. Took out the trash. Yogurt needs replaced it's out of date. Shis is walking much bett today. Sprayed out shower & used comet. Cleaned Shis teeth.

Wednesday — May 17

I came at noon. Gave Shis a shower. Also lotion & shave, and a foot massage. Did laundry. Gave Shis lunch meds around 1:20 pm. He ate pizza after he took his meds. Also put lotion on face after shaving. We played a little racketball also. Cleaned shower. Shis is walking pretty good today. Changed the bed today. Also he ate some Chinese food, too!

Friday – May 19

I got here at noon. Shis took a shower after sleeping in for a little bit. Changed trash & cleaned the potty chair. Took his pills around 12:30 p.m. & ate his lunch at 12:50 p.m. I vacuumed the floor. Brought a clean Bathrobe for Shis (New & freshly washed) for after his shower. (He always says he is cold.) I shaved him & put a little lotion on his face. Filled up the pill dispenser. Shis didn't feel like exercising today.

Saturday — May 20

I got home at 5p.m. Gave Shis a shower. He had enough clean clothes, so I will wait till monday to do the laundry. Gave him a foot massage w loti & also full body to arms also. Empt potty chair. Urine looked pretty clear, that's good. Shis says he already took his pills? Wiped off his potty chair. Shis laid back down after his bath. Cleaned his glasses also.

Monday — May 22

I got here at noon. Shis was standing up. Drank some warm soymilk & then took a shower. Lotion afterwards. Took lunch pills around 12:30 p.m & ate right before 1 p.m. Eating nice vegetarian food. Very healthy. I started laundry & changed the bed. Vacuumed & took out the trash. Shis walking ok today. Cleaned his glasses. No pee in the potty chair? Played a little racketball. Shis looked at his pictures, seemed kind of lonely. I put the one of him & Kaar up where he could see it. I shaved him also.

Wednesday — May 24

I got here around 12 p.m. Gave Shis shower & lotion. Emptied potty chair. Urine output OK & color. Clean clothes on him. Did not laundry today. Put dirty clothes in laundry Bag & hung up towel. Shis took his pills around 12:20 p.m & ate at 12:40 or so. A eating 1 piece of pizza. Cleaned micro vacuumed & cleaned his glasses. Shis is walking much better today. (Very good) Shaved him at 1 p.m, or so. Put away & stacked ensures & water Bottles on the shelf. We played racketball. Massaged his feet. (extra) Shis seemed a little hyper today. ☆ Heard Shis bones "creaking" again. ☆



Friday — May 26

I got here around 12 p.m. Gave Shis a shower. Took pills (lunch-dose) before his shower. Full body lotion. Emptied urine. Strong smell but clear. Did laundry. Shis ate around 12:30 or so. Had sweet snacks also. Did extra vacuuming today. (Steps to downstairs) with Dyson vacuum (cordless). Also regular vacuuming. Cleaned glasses. Shis was tired & laid down at 1:15 p.m. I massaged his feet & hands. No Shave today, or exercise. Maybe tomorrow. Shis was walking ok, today. Sprayed out the shower & cleaned the toilet with spray & comet. Filled up the pill dispenser of the Carbidopa. Emptied the trash.

24/60/240

Saturday - May 27

I got here at 5p.m. Shis was on his knees & had 'slid' on the floor. He seemed ok, though. I picked him up & he seemed to walk ok, but reluctant to stand all the way up, at first. Gave him a shower & lotion also. Put on clean clothes & shaved him. Shis seemed disoriented & had trouble comprehending things. Also tremors to mouth & hand. Took evening meds before 6p.m. gave him provastatin because I was unsure if he took it at lunch??? So because he had symptoms of not taking it, I gave it to him anyway. Room very hot when I arrived. Heat was turned on??? I vacuumed the floor & took out the trash. Seemed to want to lean over in the chair, so I propped him up with his pillow. Jen asked me to inventory the pills & count them to see what was missing each day I work. Shis ate pizza & fruit for supper.

16 | 551

Monday — May 29

I got here at 11:35 a.m. Shis was up. I gave him meds around noon. He was contrary about swallowing them & also insisted on drinking ensure, also. Threw a fit about it. Was very dopey acting. When I counted the pills I found out why. He had not taken the provastatin since I gave to him on Sat evening. He needs 1 a day. Did lots of laundry & changed the bed. I am staying over today. Gave Shis a foot massage & hand massage. Shis kept falling over when he was eating? Don't understand why? Took out the trash. Scrubbed bathtub with Comet. Vacaumed the hall & Shis room. Shis took his evening pills at 4:30 p.m., or so, ate afterwards. Laid back down after eating. Shis slept alot today off & on. Left at 7:50 p.m.

Wednesday – May 31,

I got here a little early today. Talked to Jen about the medicine. Also fixed medicine in the new container I bought. Jen will give to him when I'm not here. Gave Shis a shower & lotion. Vacuumed the floor & took out the trash. He took lunch meds at 12:20pm. Then I shaved him & gave him a foot massage. He ate snacks after his shave. Shis seems to be walking much better today. I'm happy about that.

Friday — June 2

I got here a little early. Brought a cake with me. Gave Shis a shower & lotion. Did laundry. Gave him his lunch pills. He is eating a snack at 1:40 p.m. A little break in between. ☆ Some symptoms of dopey acting may be coming from getting the pills & not eating after 20 min ☆. Took out the trash & vacumed. Me & Shis played racketball & he did good with it. I Shaved him & put lotion on his feet. (foot massage.) Shis is walking good today. Washed hair with a wash cloth. Gave him lotion on his face & a little facial massage.

Saturday, June 3

I got here at 5p.m. Shis took a shower & had full body lotion. Clean clo[illegible] I vacuumed. Gave Shis his pills at 5:30 p.m. (lunch time pills) he ate crissant & strawberries at 5:50p.m. Shis in a good mood & walking ok. Put poly 1 ointment on his head. Cleaned & scrubbed the pot chair. Clean bedpad on the bed.

☆ Shis fell over in the chair again. Had head on desk, didn't seem like he hurt himself. ☆ Don't know what is causing this. Took him to pee before I left at 7p.m. He laid down.

Monday - June 5

I got here at noon. Gave Shis a shower & full body lotion. Clean clothes, also changed the bed. I vacuumed the floor. Propped up Shis with a pillow while he ate. Cleaned the potty chair. Am doing laundry today. No lunch pills yet. Not sure when Jen gave the morning pills. Will take a little later. I will be working over till 7pm today. Shaved Shis & gave him foot massage. Jen came in & did some karate with ~~[illegible]~~ Shis. Scrubbed the bath tub. ~~Finished~~ laundry. Shis laid down at 2 or so. Gave him more massage. Took lunch pills at 3:10. Ate fruit & a little yogurt at 3:30p.m. He had other food at 4:15p.m. Me & Shis played racketball at 5 or so. I scrubbed some stains off the carpet. Shis found a rotten strawberry under his potty chair. He laid back down after 5p.m. I did up the pills for the week today. Shis took his evening pills at 6:25p.m & ate at 6:45. Took a nap around 6p.m. Slept soundly.

Wed, June 7

I got here around noon. Shis was laying down. Got him up & gave him a shower. Also full body lotion & clean clot No laundry today. Put fresh pads on the bed. emptied & scrubbed potty chair. Vacuum the floor. Took out the trash. Shaved him & gave him a foot massage. Took lunch pills around 1:15 p.m. Ate a little debbie snack after that around 1:30 p.m. Laid down at 1:45 p.m.

Friday – June 9

I got here around noon. Cleaned the bathroom up a bit. Scrubbed toilet & wiped it off. Also sink. Gave [redacted] a shower & clean clothes & lotion. Did laundry today. [redacted] played racketball. Vacummed & took out the trash. Shaved him & gave him a foot massage. Gave him lunch pills at [redacted] 1:30 p.m on empty stomach. [redacted] tried to eat, I tried to stop him & told him he had to wait a few minutes. Ate lunch at 1:45 p.m.

Saturday — June 10

got here at 5p.m. Gave Shis a shower. He complained of being dizzy. Took him to shower in the wheel chair. He could stand up some. Jen said that he had been hallucinating again. Had lotion & clean clothes. Emptied his potty chair. Shis took his [illegible] pills at 5:30p.m. ~~Ate~~ yogurt & 7up at 5:50p.m. Took out the trash.

W & L LAW LIBRARY

(R.I.1996) (quoting *McInnis v. Harley–Davidson Motor Co.*, 625 F.Supp. 943, 952 (D.R.I.1986)). However favorable to its defense in the federal court, Smith was a stranger to the bill of sale between the receiver and Sherwood and thus has no standing to come before a court arguing in favor of its own interpretation of the original sales contract. *Id.*

[2–4] Although our ruling with respect to the standing issue is dispositive of the appeal, we nonetheless point out that Smith's substantive arguments are without merit. "The power to grant a *nunc pro tunc* order * * * is an inherent power whereby the trial court may * * * correct or amend the record * * * 'where [it] contains an incorrect entry or fails to record a substantial occurrence in the proceeding.'" *DeCarli v. Webber,* 784 A.2d 288, 290 (R.I.2001) (per curiam) (quoting 20 Am.Jur.2d *Courts* § 29 (2000)). Accordingly, the Superior Court justice had the power to authorize the receiver to make a confirmatory assignment to clarify the court-monitored bill of sale. "In reviewing this decision by a hearing justice who sat without a jury, we will not reverse the ruling unless the hearing justice misconceived or overlooked relevant evidence or was otherwise clearly wrong." *Yates v. Hill,* 761 A.2d 677, 679 (R.I.2000) (per curiam).

[5] For a justice of the Superior Court to reform a written contract, "it must appear by reason of mutual mistake that the parties' agreement fails in some material respect to reflect correctly their prior understanding." *Id.* at 680. In support of the petition, both parties to the bill of sale, the receiver and Sherwood, affirmed that to the extent the contract as written did not assign Rosen's copyrights to Sherwood, the bill of sale did not reflect their mutual understanding that those rights had been transferred. These affidavits were sufficient evidentiary support for the order allowing the receiver to assign the rights to Sherwood *nunc pro tunc.* *See Bloom v. Hearst Entertainment, Inc.,* 33 F.3d 518, 524 (5th Cir.1994) (declaring, in affirming a trial court's decision that intellectual property rights had been conveyed in an ambiguous contract, that "one would be hard pressed to imagine more compelling extrinsic evidence of the parties' intent than the unanimous assent of opposing negotiators"). Nor was the order preempted by the Copyright Act. The order did not address whether copyrights existed for purposes of federal law. It merely allowed the receiver to assign to Sherwood, *nunc pro tunc,* whatever copyrights may have belonged to Rosen.

In summary, therefore, we deny and dismiss Smith's appeal, and affirm the order of the Superior Court, to which we return the papers in this case.

Chief Justice WILLIAMS did not participate.

**John JALOWY**

**v.**

**The FRIENDLY HOME, INC. et al.**

**No. 2001–238–Appeal.**

Supreme Court of Rhode Island.

March 26, 2003.

Son of nursing home resident who was barred by nursing home from visiting resident brought action against the home and its administrator, alleging that, in barring

support for the
ır to assign the
pro tunc. See
nment, Inc., 33
4) (declaring, in
cision that intel-
l been conveyed
that "one would
e more compel-
the parties' in-
ıssent of oppos-
was the order
;ht Act. The or-
ther copyrights
'ederal law. It
er to assign to
whatever copy-
o Rosen.

we deny and
d affirm the or-
't, to which we
se.

S did not

'Y

E, INC. et al.

ıpeal.

ɔde Island.

)3.

ɜsident who was
ɔm visiting resi-
t the home and
that, in barring

him from the premises, defendants had retaliated against him in violation of the Abuse in Health Care Facilities Act and alleging that they committed intentional and negligent infliction of emotional distress. The jury found in favor of defendants on the retaliation claim, but for resident's son on his emotional distress claims. Son moved for judgment notwithstanding the verdict or for a new trial on the retaliation claim, and for an additur and a new trial on the emotional distress claims. The Superior Court, Providence County, Clifton, J., denied son's motions and, notwithstanding the jury's verdict, granted defendants judgment as a matter of law on the claim of intentional infliction of emotional distress. Resident's son appealed. The Supreme Court, Flanders, J., held that: (1) having filed one or more reports under the Abuse in Health Care Facilities Act, resident's son was thereby entitled to sue for relief under the Act and to obtain the benefit at trial of a rebuttable presumption that his banishment from the nursing home amounted to retaliation against him for filing reports, and (2) home's actions were not so extreme and atrocious a response to son's perceived intemperate behavior that they could be described as utterly intolerable in civilized community so as to give rise to claim for intentional infliction of emotional distress.

Affirmed.

**1. Health ⟹751**

Abuse in Health Care Facilities Act provided son of nursing home resident with protection against retaliation for son's writing letter to the nursing home voicing concern that nurses were neglecting their duties, telephoning the Departments of Health and Elderly Affairs to report an incident of alleged neglect at the home, and sending letter addressing this incident to the Department of Elderly Affairs, despite the fact that resident's son never filed a formal report that included all the statutorily specified information that such reports had to contain. Gen.Laws 1956, §§ 23-17.8-2, 23-17.8-5(b).

**2. Health ⟹751, 817**

Having filed one or more reports under the Abuse in Health Care Facilities Act, however incomplete they might have been, nursing home resident's son was thereby entitled to sue for relief under the Act and to obtain the benefit at trial of a rebuttable presumption that his banishment from the nursing home amounted to retaliation against him for filing reports. Gen.Laws 1956, § 23-17.8-5(b).

**3. Health ⟹827**

Trial judge's instruction that nursing home had "no obligation to prove anything" and that burden was upon son of nursing home resident to prove his retaliation claim was erroneous because it failed to accord son the benefit of the statutory rebuttable presumption that son's banishment from nursing home amounted to retaliation for filing reports alleging violation of Abuse in Health Care Facilities Act. Gen.Laws 1956, § 23-17.8-5(b).

**4. Appeal and Error ⟹215(1)**

Although trial court's instruction was erroneous because it failed to accord son of nursing home resident benefit of statutory rebuttable presumption that his banishment from home amounted to retaliation for filing reports alleging violation of Abuse in Health Care Facilities Act, instruction, as read, became law of case since son did not object to it, and even though son belatedly attempted to argue this point in connection with his post-verdict motions, court did not err in refusing to apply presumption in deciding these motions after previously instructing jury as it did, and this was because son had

waived any right to obtain benefit of presumption when he failed to request appropriate instruction and failed to object to court's instruction. Gen.Laws 1956, § 23-17.8-5(b).

**5. Health ⚬=817**

Nursing home and its administrator rebutted statutory presumption that banishment of resident's son from nursing home was in retaliation for son's filing of reports alleging violation of Abuse in Health Care Facilities Act; one of the home's nurses testified that resident's son would insult the aides and was uncooperative with staff during his visits to the home and that, on night before home terminated his visitation privileges, resident's son had called one staff member a "pencil-pushing bitch" and then put his fist to nurse's face and said "And you, too," and home's staff had complained that, while visiting resident, son had attempted to feed another resident and was, in general, "running rampage around the facility." Gen.Laws 1956, § 23-17.8-5(b).

**6. Appeal and Error ⚬=867(1)**
**New Trial ⚬=157**

By rejecting nursing home resident's son's alternate motion for a new trial on his retaliation claim against home under Abuse in Health Care Facilities Act in a few scant, conclusory sentences, trial judge failed to independently weigh the evidence, to pass on the credibility of witnesses, and to draw reasonable inferences therefrom, as Supreme Court required, and in such circumstances, Supreme Court would apply the appellate rule and examine the record to determine whether there was any competent evidence that could support the jury's verdict for nursing home. Gen. Laws 1956, § 23-17.8-5.

**7. Judgment ⚬=199(3.3, 3.14)**

In granting nursing home's motion for judgment as a matter of law on emotional distress claim brought by nursing home resident's son, who was barred from home, the trial justice erred by effectively treating it as a new-trial motion and concluding that son's case was "against the fair preponderance of the evidence," and judge also erred when he mischaracterized son's banishment from home as merely "limiting" son's visits.

**8. Judgment ⚬=199(3.2, 3.3)**

When ruling on a motion for judgment as a matter of law after the close of the evidence, the trial justice should consider the evidence presented at trial in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and should draw all reasonable inferences from the evidence to support the position of the nonmoving party.

**9. Damages ⚬=50.10**

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show extreme and outrageous conduct on the part of the defendant.

**10. Damages ⚬=208(6)**

Whether conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for intentional infliction of emotional distress is a matter of law to be decided by a court, and if the court answers that question in the negative, it should grant judgment as a matter of law and dismiss such a claim; however, in deciding this question of law, a court may need to rely on the jury to determine whether the party bearing the burden of proof has proven the existence of certain duty-triggering facts. Restatement (Second) of Torts, § 46.

**11. Judgment ⚬=199(1)**

When considering a judgment as a matter of law after a jury has returned a

W&L LAW LIBRARY

verdict and resolved certain factual issues, a court has a duty to reconcile, if possible, a jury's interrogatory responses on any reasonable theory consistent with the evidence.

**12. Damages ⇔50.10**

Although nursing home's nonretaliatory withdrawal of its consent for resident's son to visit with nursing home resident and home's other alleged misdeeds, including close monitoring of resident's son while he was on the premises, were no doubt stress-inducing, home's actions were not so extreme and atrocious a response to son's perceived intemperate behavior that they could be described as utterly intolerable in civilized community so as to give rise to claim for intentional infliction of emotional distress; as owner of real estate, one of the fundamental rights that home possessed was right to exclude unwanted interlopers from its premises, and home did nothing to prevent son from visiting with resident off the premises.

**13. Asylums ⇔5**
**Health ⇔582**

Residents in assisted-living homes enjoy a conditional statutory right to have visitors of their choice without restrictions so long as those visitors do not pose a health or safety risk to other residents, staff, or visitors, or a risk to property, and comply with reasonable hours and security procedures. Gen.Laws 1956, § 23-17.4-16(a)(2)(viii).

**14. Judgment ⇔199(3.15)**

Trial justice erred in balancing the evidence adduced by nursing home and its administrator against the evidence introduced by nursing home resident's son, who was barred by home from visiting resident, when ruling on motion by home and its administrator for judgment as a matter of law with respect to son's claim of intentional infliction of emotional distress.

**15. Damages ⇔50, 51**

Only two classes of persons may bring claims for negligent infliction of emotional distress: those within the "zone-of-danger" who are physically endangered by the acts of a negligent defendant, and bystanders related to a victim whom they witness being injured.

**16. Damages ⇔50**

Nursing home resident's son, who was barred by home from visiting resident, failed to establish claim for negligent infliction of emotional distress against home because resident's son was not physically endangered by nursing home's alleged negligence, son did not otherwise fall within the specified classes of persons who could bring claims for negligent infliction of emotional distress, and son alleged that his stress resulted from nursing home's deliberate, retaliatory acts directed against himself, rather than at a relative.

---

Thomas Dickinson, Providence, Bruce P. Gladstein, Avon, CT, for Plaintiff.

Thomas R. Bender, Joseph A. Rotella/James T. Murphy, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This is a case about an unwelcome visitor to an unfriendly nursing home. At least this is how the parties perceived each other. Although the defendant nursing home dubbed itself "The Friendly Home, Inc." (home), this euphonic appellation proved to be a particularly galling misno-

W & L LAW LIBRARY

mer to the plaintiff, John Jalowy (Jalowy). Indeed, the parties' dealings with each other in late 1992 and early 1993 could be characterized in many different ways, but "friendly" was not one of them. At that time, Jalowy's mother, Stacia Jalowy, was a resident of the home, an assisted-living facility for elderly residents in Woonsocket. According to Jalowy, the home unlawfully retaliated against him for complaining about its nurses—and tortiously inflicted him with emotional distress—when it barred him for six weeks in 1993 from visiting his mother there. The home, however, contended that, in doing so, it merely was protecting its residents and staff from Jalowy's increasingly rancorous visits, during which, among other hostile confrontations and recriminations, he called one nurse a "pencil-pushing bitch" and threatened another by raising his fist to her face. Ultimately, a Superior Court jury tasted this curdled milk of human kindness before spitting out a split verdict that pleased neither side.[1]

In February 1993, approximately one month after he was given the boot, Jalowy filed a Superior Court lawsuit against the home and its administrator, defendant Angelo Rotella (collectively, defendants). He alleged that, in barring him from the premises, defendants had retaliated against him in violation of the Abuse in Health Care Facilities Act, G.L.1956 chapter 17.8 of title 23 (the act). Eventually, he also accused defendants of intentional and negligent infliction of emotional distress. After hearing the evidence at trial, a Superior Court jury answered the court's written interrogatories concerning these claims. The jury found in favor of defendants on the retaliation claim, but for Jalowy on his emotional-distress claims. Although the jury awarded him no compensatory damages, it found defendants liable for $50,001 in punitive damages on Jalowy's claim for intentional infliction of emotional distress. Thereafter, Jalowy moved for judgment notwithstanding the verdict or for a new trial on the retaliation claim, and for an additur and a new trial on the emotional-distress claims. The defendants responded by moving for judgment as a matter of law on the claim of intentional infliction of emotional distress. The trial justice denied Jalowy's motions, but, notwithstanding the jury's verdict, he granted defendants judgment as a matter of law on the claim of intentional infliction of emotional distress. Jalowy has appealed from that judgment.

### Facts and Travel

Jalowy's mother, Stacia Jalowy, became a resident of the home in 1992. She lived there until her death in 1997. Jalowy had wanted her to move into his own house with him, but his brother, Joseph, who was their mother's legal guardian, decided instead to move her into the home.[2] During 1992, Jalowy regularly visited with his mother at the home, seeing her there several times each week. While visiting, he observed how certain members of the home's nursing staff were disporting themselves on the premises, concluding that their behavior was unprofessional and harmful to the residents. This led him to discharge a volley of verbal and written complaints concerning the home and its nurses. Initially, on May 5, 1992, he wrote a letter to the home's management, con-

1. William Shakespeare, Macbeth, act. 1, sc. 5 (Lady Macbeth: "[Y]et do I fear thy nature; It is too full o' th' milk of human kindness / To catch the nearest way.").

2. Jalowy had challenged Joseph's appointment as their mother's guardian in 1991 court proceedings, and later filed objections in the probate court concerning Joseph's accounting with regard to his mother's estate.

tending that two staff nurses, Joan Thibault and Maureen Stone, were regularly "smoking and socializing" and causing "a detriment to the elderly people * * *." He also met with Rotella to discuss what he had written in the letter. After the meeting, another incident occurred in which Jalowy observed the same two nurses ignore "two very helpless people * * * [who were] begging for help." After this event, Jalowy called the State Department of Health and the Department of Elderly Affairs to report what he had witnessed at the home. On August 28, 1992, he also sent a letter detailing this episode to the attention of the Department of Elderly Affairs.

On December 31, 1992, as Jalowy was departing the home, he encountered the two nurses that he had complained about previously. He suspected that they had been following him around the premises and making fun of him. The particulars of this incident were sharply disputed at trial, but from defendants' standpoint, it climaxed when Jalowy angrily confronted the nurses, swore at one of them, then brandished his fist in the face of the other. In any event, this New Year's Eve imbroglio proved to be the final straw that broke defendants' willingness to allow Jalowy to continue visiting his mother at the home. Thus, the next day, on January 1, 1993, Rotella told Jalowy:

> "You are no longer welcome [at the home]. Go out and get a court order. Do whatever you need to. You can visit your mother at your brother's house, sister's house. We can't allow you to be here. It's not a safe situation."

Approximately one month later, on February 2, 1993, Jalowy took up Rotella on his suggestion and went to Superior Court seeking injunctive relief and damages. There, he obtained the court order that Rotella indicated would be required for his readmission to the home as a visitor. His complaint alleged that Rotella and the home violated § 23–17.8–5 by retaliating against him for reporting instances of abuse and neglect at the home. He also alleged that they violated his "Constitutional Freedom of Association." A Superior Court justice issued an order temporarily enjoining defendants from barring Jalowy from visiting with his mother at the home. With the cooperation of counsel for the parties, the court set up an agreed-upon schedule allowing Jalowy to visit his mother in the home's lobby three days a week for one hour each visit. The parties amended this schedule of visits several times, but it remained substantially the same throughout the pendency of the lawsuit, until Jalowy's mother died in 1997.

In 1995, the Superior Court entered summary judgment for defendants on Jalowy's constitutional claim. Four years later, in 1999, Jalowy moved to amend his complaint to include claims for intentional and negligent infliction of emotional distress against both defendants, which the court granted.

As previously stated, the parties eventually tried the statutory retaliation and the common-law emotional-distress claims before a jury. In response to written interrogatories, the jury found for defendants on the retaliation charge, but for Jalowy on both emotional-distress claims. The jury awarded Jalowy no compensatory damages, but it held defendants liable for punitive damages on the intentional-infliction-of-emotional-distress claim in the amounts of $25,000 against the home and $25,001 against Rotella.

Thereafter, Jalowy moved for judgment notwithstanding the verdict or for a new trial on the retaliation claim, and for an additur and a new trial on the emotional-distress claims. The defendants filed a

motion under Rule 50(b) of the Superior Court Rules of Civil Procedure for judgment as a matter of law on the claim of intentional infliction of emotional distress. In a written decision, the trial justice denied Jalowy's requests but granted defendants' motion. He then entered a judgment providing "[t]hat plaintiff * * * take nothing, [and] that the action be dismissed on the merits," from which Jalowy has appealed. Although the parties have argued other issues on appeal besides the ones we address below, because of our disposition of these issues it is unnecessary for us to reach these other alleged errors and arguments.

W & L LAW LIBRARY

### Retaliation Under the Abuse in Health Care Facilities Act

Jalowy first argues that the trial justice erred in refusing to grant him judgment notwithstanding the verdict or a new trial with respect to his claim that defendants retaliated against him for filing a report alleging a violation of the act. The trial justice denied Jalowy's motion on two grounds: (1) that Jalowy never filed a report containing sufficient information to warrant statutory protection under the act from retaliation; and (2) that, even if he did file such a report, the evidence adduced at trial was such that reasonable jurors could differ on whether Jalowy's banishment was the product of retaliation for his complaints to governmental authorities, or whether it was simply a legitimate response—however wrong-headed and heavy-handed—to what the home perceived to be Jalowy's threatening and disruptive behavior when he was on the premises as a visitor. In other words, the trial justice believed that a reasonable jury could conclude from the evidence introduced at the trial that the home had imposed the banishment sanction in question for reasons other than to retaliate for Jalowy's complaints about the nurses.

Jalowy contends that, as a person who was not required to file a report under the act, he was not obliged to provide all the information that the act requires in a report to obtain the statutory protection from retaliation. Further, he argues, he was entitled to a rebuttable presumption that defendants' actions were retaliatory, and that defendants failed to rebut that presumption.

[1] We agree with Jalowy that the trial justice erred in finding that the act did not entitle him to assert a claim for retaliation merely because his complaints did not meet all the statutory requirements that a report to the Department of Health must contain, as outlined in § 23–17.8–2. Section 23–17.8–5(b) of the act provides protection against retaliation even to those who were merely "about to make a report." In this case, Jalowy introduced enough evidence that a jury could have found that he was, at a minimum, about to make a report. He testified that he wrote a letter to the home voicing concern that the nurses were neglecting their duties, telephoned the Departments of Health and Elderly Affairs to report an incident of alleged neglect at the home, and even sent a letter addressing this incident to the Department of Elderly Affairs. Thus, the act provided him with protection against retaliation for these acts, despite the fact that he never filed a formal report that included all the statutorily specified information that such reports must contain.

[2–4] We also agree with Jalowy's contention that, having filed one or more reports under the statute—however incomplete they may have been—he was thereby entitled to sue for relief under the statute and to obtain the benefit at trial of a rebuttable presumption that his banishment from the home amounted to retaliation. *See* § 23–17.8–5(b) ("Where a facility

discharges, demotes, or retaliates by any other means against a person after he or she has made a report, testified, or was subpoenaed to testify as a result of a report required by this chapter, there shall be a rebuttable presumption that the facility discharged, demoted, or retaliated against that person as a result of his or her report or testimony."). But when Jalowy failed to request such an instruction, the trial justice instructed the jury that defendants had "no obligation to prove anything" and that the "burden is upon Mr. Jalowy to prove his claim to you." Although this instruction was erroneous with respect to Jalowy's retaliation claim because it failed to accord Jalowy the benefit of the statutory presumption, Jalowy did not object to it. As a result, the instruction as read became the law of the case. *See, e.g., Habib v. Empire Productions, Inc.*, 739 A.2d 662, 665 (R.I. 1999)(per curiam). And even though Jalowy belatedly attempted to argue this point in connection with his post-verdict motions, the trial justice did not err in refusing to apply the presumption in deciding these motions after previously instructing the jury as he did. This is so because Jalowy had waived any right to obtain the benefit of this presumption when he failed to request an appropriate jury instruction on this point and when he failed to object to the court's jury instructions that did not accord him the benefit of the statutory presumption. *Id.* Thus, according to the court's unobjected-to but erroneous instructions, Jalowy bore the burden of proving defendants' retaliatory motive in barring him from the home without the benefit of the statutory presumption.

[5] But even if Jalowy had requested an appropriate jury instruction on the statutory presumption and had objected on a timely basis to the court's proposed instructions that failed to instruct the jury accordingly—and even if the court thereafter had instructed the jury about the statutory presumption of retaliation—such a presumption would have been rebuttable by defendants. *See* § 23-17.8-5(b). And here, most tellingly, defendants introduced sufficient evidence for the jury to find that, presumption or no, defendants' actions toward Jalowy were not in fact taken in retaliation for his complaints about the nurses. For instance, Maureen Stone, one of the home's nurses, testified that Jalowy "would insult the aides," and was uncooperative with the staff during his visits to the home. Stone further testified that, on the night before defendants terminated his visitation privileges, Jalowy had called one nurse a "pencil-pushing bitch" and then put his fist to Stone's face and said "And you, too." Rotella testified that he had received complaints from the staff that, while visiting his mother, Jalowy had attempted to feed another resident and was, in general, "running rampage around the facility." Thus, "[b]ased upon the information that was given to [him] by [his] staff," Rotella "felt [plaintiff] was a threat to the safety and welfare of the patients and employees." The jury could have relied upon such evidence in concluding that defendants' decision to exclude Jalowy from the home was not triggered by a retaliatory motive keyed to his complaints about the home's supposedly lazy and heartless nurses, but rather by defendants' legitimate concern for the safety and security of the home's staff and residents—irrespective of whether Jalowy had complained to various authorities about some of the nurses' conduct.

Furthermore, as the trial justice correctly noted, this evidence was such that reasonable minds could differ on whether the home's action in barring Jalowy from the premises was in retaliation for Jalowy's reporting activity or was merely a legitimate administrative response designed to

W & L LAW LIBRARY

protect the staff and residents from the threatening acts of a perceived troublemaker. *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 288 (R.I.1999). Thus, despite the court's failure to instruct the jury about the statutory presumption, we affirm the trial justice's decision not to grant Jalowy's motion for judgment notwithstanding the verdict on the retaliation claim. *Id.*

[6] With regard to the trial justice's decision denying Jalowy's alternate motion for a new trial, we conclude that by rejecting it cursorily in a few scant, conclusory sentences, he failed to independently weigh the evidence, to pass on the credibility of witnesses, and to draw reasonable inferences therefrom, as we require. See, *e.g., Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 254 (R.I.1996). In such circumstances, we apply the appellate rule and examine the record to determine whether there is any competent evidence that could support the jury's verdict. *Hefner v. Distel*, 813 A.2d 66, 70 (R.I.2003). As described above, defendants introduced sufficient evidence to support the jury's conclusion that the home's actions vis-à-vis Jalowy were not retaliatory, and thus we affirm the court's denial of Jalowy's new-trial motion on the retaliation claim.

### Intentional and Negligent Infliction of Emotional Distress

[7] In deciding that defendants were entitled to judgment notwithstanding the verdict with respect to Jalowy's claims for intentional infliction of emotional distress, the trial justice ruled that:

> "In reviewing the evidence in the light most favorable to [plaintiff] and in providing him with the benefit of all reasonable and legitimate inferences, this Court determines that the jury's finding * * * fails to respond truly to the merits of the controversy and *is against the fair preponderance of the evidence.* This Court finds that *based upon the evidence offered by both sides at trial,* the conduct of defendants was not 'so outrageous in character and so extreme in degree' to warrant a finding for intentional infliction of emotional distress. Here, defendants' practice of monitoring and limiting Jalowy's visits may have been inconvenient and offensive to him, [but] it is 'a far stretch * * * to characterize it as so extreme and outrageous as to be atrocious and utterly intolerable in a civilized community.' *Swerdlick v. Koch*, 721 A.2d 849, 863 (R.I.1998)." (Emphases added.)

In granting defendants' motion for judgment as a matter of law, the trial justice erred by effectively treating it as a new-trial motion and concluding that Jalowy's case was "against the fair preponderance of the evidence." He also erred when he characterized defendants' banishment of Jalowy from the premises as merely "defendants' practice of * * * limiting Jalowy's visits." The banishment here amounted to much more than just "limiting Jalowy's visits."

[8] When ruling on a motion for judgment as a matter of law after the close of the evidence, the trial justice "should consider the evidence presented at trial in the light most favorable to the nonmoving party, *without weighing the evidence* or evaluating the credibility of witnesses, and should draw all reasonable inferences from the evidence to support the position of the nonmoving party." *Swerdlick v. Koch*, 721 A.2d 849, 856 (R.I.1998). (Emphasis added.) On review, this Court applies the same standard. *Id.* Although we hold that the trial justice erred when he balanced the evidence as he did and mischaracterized Jalowy's banishment as merely "limiting Jalowy's visits," we ultimately agree with his conclusion to grant defendants'

motion upon applying the standard he should have employed.

[9] To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "extreme and outrageous conduct on the part of the defendant." *DiBattista v. State,* 808 A.2d 1081, 1088 (R.I. 2002). In deciding whether the evidence introduced at trial can support a jury finding of extreme and outrageous conduct, this Court has adopted the very high standard set forth in the Restatement (Second) *Torts* § 46 (1965) with regard to what evidence is required to satisfy this element of the claim:

> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Swerdlick,* 721 A.2d at 863 (quoting Restatement (Second) *Torts,* § 46 cmt. *d* at 73).

[10, 11] Whether conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery" for intentional infliction of emotional distress is a matter of law to be decided by a court, and if the court answers that question in the negative, it should grant judgment as a matter of law and dismiss such a claim. *See* Restatement (Second) *Torts,* § 46 cmt. *h.* In deciding this question of law, however, a court may need to rely on the jury to determine whether the party bearing the burden of proof has proven the existence of certain duty-triggering facts. *See Kuzniar v. Keach,* 709 A.2d 1050, 1055–56 (R.I.1998). Thus, in this case, a finding by the jury that defendants had retaliated against Jalowy for complaining to the regulatory authorities about the nurses at the home may well have sufficed to warrant the jury's returning a verdict for Jalowy on the intentional-infliction claim. Further, when considering a judgment as a matter of law after a jury has returned a verdict and resolved certain factual issues, a court has a duty to reconcile, if possible, a jury's interrogatory responses on any reasonable theory consistent with the evidence. *Pierce v. Southern Pacific Transportation Co.,* 823 F.2d 1366, 1370 (9th Cir.1987). In this instance, because the jury concluded that the home did not retaliate against Jalowy for complaining about the nurses, the trial justice's job in passing on the various post-verdict motions was to determine whether the evidence entitled the jury to find that defendants' actions were nonretaliatory under the act and, if so, whether such actions nonetheless were so extreme and outrageous as to permit a verdict in favor of Jalowy to stand on the intentional-infliction claim.

The most compelling evidence Jalowy introduced to satisfy the outrageous-conduct element of his intentional-infliction claim was Rotella's decision on January 1, 1993, to bar Jalowy from visiting with his mother at the home. As Jalowy testified at trial, when he met with Rotella on January 1, he did not even let Jalowy finish explaining what had happened during his most unpleasant New Year's Eve encounter with the home's nurses when Rotella peremptorily informed him of his immedi-

ate ouster from the home. Thus, Rotella told him, "As of 3:20 today you are officially barred from this facility and the grounds." After this decree of banishment, Jalowy did not see his mother again at the home for approximately six weeks. He was allowed back into the home only when he obtained a temporary restraining order from the Superior Court after he filed this lawsuit. The order, effective February 4, 1993, established a visitation schedule allowing Jalowy to meet with his mother one hour a night for three nights a week in the home's lobby.

The key question for this Court on appeal is whether defendants' nonretaliatory banishment of Jalowy from the home—thereby preventing him from visiting there with his mother for an approximate six-week period in 1993—together with defendants' antecedent and subsequent monitoring conduct, including allegedly ordering the nursing staff to closely follow Jalowy when he was on the premises—were acts that, as a matter of law, a jury could find *"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."* *Swerdlick,* 721 A.2d at 863 (quoting Restatement (Second) *Torts* § 46 cmt. *d* at 73). In *DiBattista,* we acknowledged that the defendants' "swift action"—pursuant to which the Department of Children, Youth and Families revoked the plaintiffs' license to serve as foster-care parents one day after the agency informed the parents it was considering such a decision, and then summarily removed the children involved from their custody—was conduct that "doubtlessly caused * * * emotional distress." *DiBattista,* 808 A.2d at 1088. Nonetheless, we held that the plaintiffs' claim failed as a matter of law because they did not allege any facts indicating extreme and outrageous conduct under the circumstances presented by that case. *Id.*

[12] Likewise, under the circumstances of this case, defendants' withdrawal of their consent for Jalowy to visit with his mother at the nursing home and their other alleged misdeeds—including close monitoring of him while he was on the premises—were no doubt stress-inducing. Perhaps, when viewed most favorably to Jalowy, they even could be characterized as a most unnecessary and heavy-handed overreaction on defendants' part to Jalowy's sometimes fractious forays into the alien world of this nursing-home's administration. Yet, whether viewed in isolation or in the aggregate, defendants' nonretaliatory actions were not so extreme and atrocious a response to Jalowy's perceived intemperate behavior that a reasonable jury could find them to be " '*utterly intolerable in a civilized community.*' " *Swerdlick,* 721 A.2d at 863.

Significantly, Jalowy did not allege or prove that the home breached any contractual commitment by the actions it took against him. And despite the fact that the nursing-home business is heavily regulated by state and federal authorities, Jalowy did not direct the home, the Superior Court, or this Court to any statute or regulation that prevented defendants from excluding him from the home. Nor has he pointed us to any other official policy that outlaws such no-visitation orders in these circumstances. Indeed, nursing homes and assisted-living facilities may have legitimate reasons for restricting or preventing would-be visitors from obtaining unfettered access to residents. This is especially true under circumstances in which the home perceives that the visitor has been abusive to its staff, and continued visits might cause the environment at the home to deteriorate into one that was

more disruptiv
dents and the s

[13] Legisla
other states, as
Congress, have
how best to b
cerns of nursin
tors in protecti
members' healt
est of residents
ing reasonable
each other on t
ties. Thus, bot
ties have passe
define a reside
to certain visito
facilities that
state regulatio
§ 483.10(j)(1) (
16; Ohio Rev.
(2002); Wash.
(1994). And ev
in the balance
right of the res
access to visit
nursing home
access, none of
forceable rights
stricted access
residents of
Rhode Island,
homes enjoy a
to "[h]ave visit
restrictions so l
pose a health o
dents, staff, or
ty, and comply
security proce
16(a)(2)(viii).

Federal regu
facilities that
tures an even
tives visit with
§ 483.10(j)(1)(vi
has the right a
immediate acce

W & L LAW LIBRARY

more disruptive or unsafe for the residents and the staff.

[13] Legislatures in Rhode Island and other states, as well as the United States Congress, have addressed the question of how best to balance the legitimate concerns of nursing-home owners and operators in protecting their residents' and staff members' health and safety with the interest of residents and their visitors in obtaining reasonable if not unrestricted access to each other on the premises of these facilities. Thus, both state and federal authorities have passed laws and regulations that define a resident's rights to obtain access to certain visitors on the premises of those facilities that are subject to federal and state regulation. *See, e.g.*, 42 C.F.R. § 483.10(j)(1) (2003); G.L.1956 § 23–17.4–16; Ohio Rev.Code Ann. § 3721.13(A)(21) (2002); Wash. Rev.Code § 70.129.09(1)(f) (1994). And even though these laws differ in the balances they strike between the right of the residents to have unrestricted access to visitors and the right of the nursing home to restrict or prevent such access, none of them expressly confer enforceable rights on visitors to obtain unrestricted access to relatives or to other residents of such facilities. Thus, in Rhode Island, residents in assisted-living homes enjoy a conditional statutory right to "[h]ave visitors of their choice without restrictions so long as those visitors do not pose a health or safety risk to other residents, staff, or visitors, or a risk to property, and comply with reasonable hours and security procedures." Section 23–17.4–16(a)(2)(viii).

Federal regulations grant residents in facilities that are subject to these strictures an even broader right to have relatives visit with them. Thus, 42 C.F.R. § 483.10(j)(1)(vii), provides that a "resident has the right and the facility must provide immediate access to any resident by * * * immediate family or other relatives"—subject "to the resident's right to deny or withdraw consent at any time." A resident's right to have access to unrelated visitors is further "[s]ubject to reasonable restrictions." 42 C.F.R. § 483.10(j)(1)(viii).

But none of these laws, rules, and regulations expressly confer rights of access upon visitors—only upon the residents themselves. Much less do they expressly endow visitors with the right to maintain a civil lawsuit for damages or for equitable relief if they can establish one or more violations of these provisions.

Viewed in the light most favorable to Jalowy, but taking into account the jury's finding that defendants' actions were not retaliatory, defendants' decision to institute a total ban on his visits with his mother at the home was a drastic overreaction to his attempts to identify and remediate what he perceived to be lackadaisical and uncaring practices on the part of certain members of the home's nursing staff. Arguably, such a ban even may have been illegal vis-à-vis Jalowy's mother (if she or her legal guardian had complained about it to the appropriate authorities, which, apparently, they did not). Nevertheless, we cannot say that, under the circumstances, defendants' nonretaliatory decision to banish Jalowy from the home could be described as conduct that was "*beyond all possible bounds of decency, [so as] to be regarded as atrocious, and utterly intolerable in a civilized community.*" *Swerdlick*, 721 A.2d at 863 (quoting Restatement (Second) *Torts*, § 46 cmt. *d*, at 73).

We have held that a party may not be liable for intentional infliction of emotional distress "when [a defendant] has done no more than insist on [its] legal rights in a permissible way, even though such insistence is likely or even certain to annoy, disturb, or inconvenience [plaintiff] or even

cause [plaintiff] to suffer some emotional distress." *Swerdlick,* 721 A.2d at 863 (quoting *Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 989 (R.I. 1984)). Thus, absent a contractual provision or some law, rule, or regulation preventing the home from banning visitors such as Jalowy from obtaining access to the home for visits with relatives who are residents there—and providing such visitors with standing to raise such claims—we are not persuaded that the home acted outrageously, atrociously, and beyond all possible bounds of decency when it barred Jalowy from entering onto its premises. After all, as an owner of real estate, one of the fundamental rights that the home possessed was the right to exclude unwanted interlopers from its premises. *Nollan v. California Coastal Commission,* 483 U.S. 825, 831, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677, 686 (1987). Moreover, the home did nothing to prevent Jalowy from visiting with his mother off the premises, much less did it try to prevent or dissuade her from leaving the home to meet with Jalowy or from relocating to another facility if she had wished to do so. And certainly defendants' later actions in defending against Jalowy's suit for injunctive relief and damages—which even Jalowy did not allege exceeded their legal rights—did not constitute the type of behavior capable of giving rise to a claim for intentional infliction of emotional distress.

**[14]** In summary, then, although the trial justice erred in balancing the evidence adduced by defendants against the evidence introduced by Jalowy in ruling on defendants' motion for judgment as a matter of law, we agree with his ultimate conclusion that defendants in this case were entitled to judgment as a matter of law with respect to plaintiff's claim of intentional infliction of emotional distress.

**[15, 16]** Finally, Jalowy argues that the trial justice erred in denying his motion for an additur or a new trial on his claim for negligent infliction of emotional distress. We reject this argument because defendants were entitled to judgment as a matter of law on the negligent-infliction claim. Only two classes of persons may bring claims for negligent infliction of emotional distress: those within the "zone-of-danger" who are physically endangered by the acts of a negligent defendant, and bystanders related to a victim whom they witness being injured. *Marchetti v. Parsons,* 638 A.2d 1047, 1049, 1051 (R.I.1994). Here, the tortious behavior Jalowy cited in his complaint and at trial involved alleged misconduct directed at him: namely, defendants' decision to monitor him when he was on the premises and, ultimately, to bar him from visiting his mother at the home. Because Jalowy was not physically endangered by defendants' alleged negligence; because he did not otherwise fall within either of the above-specified classes of persons who can bring claims for negligent-infliction of emotional distress; and because he alleged that his stress in this case resulted from defendants' deliberate, retaliatory acts directed against him rather than at a relative, he failed to adduce evidence supporting a claim for negligent infliction of emotional distress. *Liu v. Striuli,* 36 F.Supp.2d 452, 480 (D.R.I. 1999); *Iacampo v. Hasbro, Inc.,* 929 F.Supp. 562, 581 (D.R.I.1996).

Because we hold that the defendants were entitled to judgment as a matter of law on both emotional-distress claims, we need not address plaintiff's arguments (1) that he was entitled to an additur or a new trial on his emotional-distress claims; (2) that the trial justice erred in refusing to let him testify about his alleged economic damages; and (3) that the trial justice erred when he allowed his attorney only forty minutes for closing arguments, even

though the applical
minutes for such arg
consider the defen
because Jalowy fail
priate physical-sym
tress his emotion
failed to prove the
*See, e.g., Vallinoto*
830, 838–40 (R.I.
physical symptom r

Con

For these reasor
and affirm the jud
Court to which we
this case.

**Theodore E**

**Melinda Blau**

**No. 200**

Supreme Cou

Marc

Purchaser bro
dor and real esta
failure to disclose
problem constitute
tate Sales Disclos
omission, negliger
breach of implied
fair dealing, breac
only, racketeering
duty by purchaser
tive trade practi
Superior Court,
berg, J., granted
favor of defendan

y argues that the ıying his motion rial on his claim f emotional dis- gument because o judgment as a egligent-infliction of persons may infliction of emo- ıin the "zone-of- y endangered by fendant, and by- tim whom they larchetti v. Par- 1051 (R.I.1994). r Jalowy cited in involved alleged im: namely, de- tor him when he ıltimately, to bar ıer at the home. hysically endan- ged negligence; wise fall within d classes of per- s for negligent- stress; and be- ress in this case deliberate, retal- nst him rather ailed to adduce m for negligent stress. *Liu v.* 52, 480 (D.R.I. *bro, Inc.,* 929 96).

the defendants as a matter of ress claims, we s arguments (1) dditur or a new ress claims; (2) d in refusing to lleged economic he trial justice is attorney only arguments, even though the applicable rule allowed sixty minutes for such arguments. Nor need we consider the defendants' contention that because Jalowy failed to introduce appropriate physical-symptoms evidence to buttress his emotional-distress claims, he failed to prove them as required by law. *See, e.g., Vallinoto v. DiSandro,* 688 A.2d 830, 838–40 (R.I.1997) (describing the physical symptom requirement).

## Conclusion

For these reasons, we deny the appeal and affirm the judgment of the Superior Court to which we return the papers in this case.

**Theodore E. STEBBINS, Jr.**

**v.**

**Melinda Blauvelt WELLS, et al.**

**No. 2001-620-Appeal.**

Supreme Court of Rhode Island.

March 27, 2003.

Purchaser brought action against vendor and real estate agents, alleging that failure to disclose severe water erosion problem constituted a violation of Real Estate Sales Disclosure Act, fraud, negligent omission, negligence, breach of contract, breach of implied duty of good faith and fair dealing, breach of warranty by vendor only, racketeering and breach of fiduciary duty by purchaser's agent only, and deceptive trade practices by all agents. The Superior Court, Newport County, Thunberg, J., granted summary judgment in favor of defendants, and purchaser appealed. The Supreme Court, 766 A.2d 369, vacated and remanded. On remand, the Superior Court, Pfeiffer, J., granted agents' motions for summary judgment. Purchaser appealed. The Supreme Court held that: (1) no right existed to file a private suit for civil damages under the Act; (2) agents had duty to disclose material defects; and (3) alleged breach of that duty could be basis for negligence and negligent omission claims, and, in the case of purchaser's own agent, a breach of fiduciary duty claim.

Affirmed in part, vacated in part, and remanded.

**1. Appeal and Error ⚷893(1)**

**Statutes ⚷184**

Questions of statutory construction are reviewed de novo by appellate court, and its ultimate goal is to give effect to the purpose of the act as intended by the Legislature.

**2. Statutes ⚷188, 189**

If the language of a statute is clear and unambiguous, court must interpret it literally, giving the words of the statute their plain and ordinary meanings.

**3. Statutes ⚷184, 188, 206**

If a statute is unclear or ambiguous, court will examine statutes in their entirety, and glean the intent and purpose of the Legislature from a consideration of the entire statute, keeping in mind the nature, object, language and arrangement of the provisions to be construed.

**4. Constitutional Law ⚷70.1(11)**

The function of prescribing remedies for statutory rights is a legislative responsibility and not a judicial task.

windows

House.

Video Camera

front Door

Driveway

mr Wu's window

Steps

ground down Here.

outside mat

Drop off

Hillside.

yard

parking lot

gradual decline

I'm here. jumping up try to ~~see~~ see in.

Monday — June 12

I got here at 11:55 a.m. A little early. Gave Shis a shower & lotion & clean clothes. Changed the bed & put a clean pad on it. Doing laundry today. Vacuumed & changed the trash. Shaved Shis & put lotion on his face. He is sleeping in the chair, will massage his feet. Let him take a nap in the bed. Shis took his lunch pills at 2:45 p.m. Ate lunch from the restaurant at 3 p.m. I did the pills for the week. ☆ One Bottle of pills had the wrong pills in the top & cotton between them & the right pills in the bottom ☆ weird Brought a Brand New Black fan for Shis room. It's too hot in here! Shis has been relaxed & napping this afternoon, he is enjoying having the fan. Also sleeping ~~better~~ with it. Shis had his evening pills at 5:55. He ate some yogurt at 6:15 p.m.

Tuesday June 13

Well, I got here at 11:55am again. Gave Shis a shower & clean clothes, a[illegible] lotion. Put away most of the soda ca[illegible] into the frig. Took Shis BP was 96/[illegible] Brought a new BP cuff to use. Also [illegible] him cran-grape juice without any su[illegible] Took out the trash & vacuumed the [illegible] Shis took his lunch pills at 1:20p.m. Shis ate a snack at 1:40p.m. Leavin[illegible] today at 2p.m. Did stomach exercises.

Wednesday – June 14

I got here at noon. Shis had a shower, lotion & clean clothes. I vacuumed. Shis took his lunch pills at 12:40 p.m. Ate around 1 p.m. Took out the trash. Shaved him while he was waiting to eat. He had a little trouble walking today. But is ok. Leaving today at 2 p.m. Took him for exercise outside & he walked around, did pretty good.

Thursday — June 15

I got here around noon. Shis was [illegible] eating. Gave him shower & vacuumed the took out trash. Doing laundry today ☆ Shis has a carpet burn on his leg[illegible] his knee ☆ Also a smaller one on his chest. Put Betadine liquid & poly ointment on it. Let it dry in the air with the fan. Cleaned the carpet near Shi[illegible] bed while he took a nap. Brought him apple juice to drink. Shis had his ~~lunch~~ pills at 1:35 p.m. Also drank some juice No Shave today. He is walking ok, but has pain in leg from his burn. Shis had a snack ~~[illegible]~~ after 2 p.m. Put him back to bed.

Friday – June 16

I got here a little early today. Shi Right Before I came had another mishap with falling forward. Cut a place on his head again. Cleaned up the mess & washed off his head & put betadine & poly ointment on it. Gave him tiny enema today. Then he had a poo & then took a shower. Got him out & dry bathrobe on him, put on diaper & clean clothes. Treated carpet burns with betadine & poly ointment & put lotion on him. He ate crackers & soda for a snack. I took out the trash. No laundry today. (Did yesterday) Vacuumed Shi's room & glass on the floor & other hallway. 120/80 BP at 1:25 p.m. He took lunch pills around 1:45 p.m.

Sat - June 17

I got here around noon. Shis had fal[len] down again on the desk. I treated skin tear, near his eye, with betadine & poly ointm[ent] (yesterday's Boo Boo) Then let him walk to the shower. He's tired & not walking too good. I may stay over. lotion & clean clothes. Treated carpet burns on leg & stom[ach] also. Shis laid down & slept after tha[t]. Cleaned refrigerator some & put away s[...] cans. No vacuum or laundry today. Tr[ash] emptied. Gave Shis a foot massage. Shis took a nap & then got up & was walking better (trying to dance with his walker) (almost) took lunch pills at 1:35 P

Shaved him & took his bp. 110/78. around 2p.m. He ate a snack after that. Also moo goo gai pan. Put Shis Back to bed at 3 or so. Moved potty chair over to bed to make it easier on him.

Sunday - June 18 Fathers day!

I got here early about 10:45 or so. Shis was still in bed. Went to eat his food & then took a shower. Got upset cause he lost his wallet. Found it under the bed. Put Betadine on burns & open sores, also poly ointment. Lotion & clean clothes on him. Doing laundry today. Vacuumed after Shis laid down to take a nap. Took out the trash. Shis took a little nap & then got up & took his pills around 1 p.m. Also peed. Very hot today. 124/66 BP 1:15 p.m. Shis had a snack of potato salad at 1:29 p.m. & crackers, eating also some of his breakfast. Changed the bed.

Monday - June 19,

I got here at 11:45 a.m. A little early. Mr Wn (Shis) had his head down in the Rice. Was asleep again. He went to the toilet, but had no success with the poo poo deal. Gave him a shower. Treated his sores with betadine & poly ointment. Lotion to his body. Clean clothes. I vacuumed the floor. Took out the trash. Took BP was 108/62 in a reclined position. Am doing medicine today & refilling it. Took lunch pills at 1:40 p.m. He is eating potato salad and crackers. No laundry today. No Shave. Gave Shis an mini enema he is trying to poo. Did a little walking before I left.

637-4121
7110
9317

Tuesday - June 20

I got here at 11:50 a.m. Shis was in a bad mood. Threw the pictures out. Frame & all to the other side of the room. (I put it there). Don't know why he was upset. Gave him a shower, lotion & ointments to sores. Clean clothes & a shave today. He took his pills at 12:50 p.m. Is eating a little lunch. May take him out to the barber shop to get a hair cut. 120/70 BP at 1:40 p.m.
Shis Decided not to go to the beauty shop. Got good exercise though.

Wednesday — June 21

I got here at 11:45 a.m. Shis was tota[lly] out of it & reclined back in the chair. Bett[er] than forward. He went to take his shower. I washed his hair twice. Gave him lotion & clean clothes. Ointments to sores. Vacuumed & took out the trash. Shis had a snack of cinamon twist I brought him. Then wen[t] to lay down & nap awhile. I cleaned the tub. Emptied potty earlier. No laundry today. No Shave. Also cleaned bathroom toilet. lunch pills at 1:35 p.m. Shis did a li[ttle] walking & had good exercise. Took BP. It was 120/60. Ate yogurt around 2 pm. I fed him.

Thursday - June 22

I got here around 12pm. Shis was lying in bed. Emptied potty & scrubbed. Took Shis to the shower & clean clothes. Treated sores with ointments. Vacuumed & took out ~~the~~ trash. lotion to his body. Am doing laundry today. Shaved him & did a little facial massage. Took BP it was 100/60. Lunch pills at 1:45 pm. But he ate at 1pm.

Friday — June 23

I got here at noon. Shis is in bed. Emptied potty & gave Shis a shower. Treated sores with betadine & ointment. Vacuumed & emptied the trash. Shis laid down & took a nap. No shave or laundry today. Shis took his lunch pills at 1:30 p.m. BP was high today. 160/90 at 1:30 p.m. (sitting in the chair) Shis is eating his lunch now. I left after 2.

Saturday – June 24

I got here around noon. Shis was in bed. Empty potty & scrubbed it out. Vacuum. Took Shis to the shower. Lotion & clean clothes afterward. Treated sores with betadine. Also poly ointment. Shis took his lunch pills at 12:40 p.m. I Shaved him while he waited to eat. Eating at 1 p.m. now. Took out the trash. Clean pad to the bed. Sip cup straw is soaking in the big cup in the bathroom. (got it out) Shis laid back down after he ate. Took BP it was 110/66, around 1:45 p.m.

Sunday - June 25

I got here about 11:45 a.m. Shis was eating. I vacuumed & emptied the potty. Am doing laundry today. Gave Shis a shower & lotion & ointment to sores. Lotion to body & clean clothes & diaper. Changed the bed today. Washed dishes. Refilled the medication tray. Massaged his feet. He took his lunch pills at 1:30pm. Bp 130/86. Shis is walking pretty good, now. Shis is eating a snack at 2pm. Stayed a little over today, cause Shis was eating.

Monday — June 26 —

I got here at 11:50 a.m. Shis had fallen on the floor again. I helped him up & he ate some crackers, a little soup & watermelon. Then he took a shower. Applied ointments to his sores & lotion to his body. Clean clothes. Vacuumed the floor & took out the trash. Gave Shis a foot massage. Shis Took his lunch pills at 1:25 p.m. Gave him a shave after that. Also lotion massage to face. Shis ate a snack of cookies at 1:45 p.m. And had shrimp foo yung at 3 or so. Took some naps after that. Also called Keni. Took his evening pills at 5:30 p.m. Took Shis BP at 5:35 p.m. Was complaining of a headache. BP was 140/90. Was a little thyper. Ate a snack of kiwi at 5:50 after pills. Shis did a little walking exercise.

Tuesday — June 27 —

Well, I got here at 10:30 a.m. Shi Was standing up & I took him to the sho Got him clean & fresh lotion & clean clot Also ointments to his sores. Hurried & loaded stuff for the motel. Emptied the po chair, though. Jen helped me take him a little outside. I took him the rest of the way. So we finally got settled here at the motel by, say noon. Shis too some naps & got up & took his pills at 2 p.m. when Tou brought his food. Ate at 2:20 p.m. fried fish & stewed green peppers, Rice & other chopped meat. Is drinkin water. Shis took some more naps. Then too his evening pills around 6 pm. Then ate some pizz for supper & mt Dew & some donut. Shis got up & ate some Blueberry muffin at 9 or so. Went pee & put on bedtime shorts.

Wednesday - June - 28

Well, ~~I~~ Shis did decent last night. Got up with him around 4 a.m. Cleaned the wet stuff up & clean clothes & put him back to bed with clean bed clothes. We got up this morning around 8 a.m. I gave him a shower & put him in the wheelchair w the Bathrobe on & gave him his meds at 8:20 am. He ate 20 min after that. Warm soymilk, coffee, grits & boiled egg (he did not like), a little muffin. And strawberry yogurt. Shis went to use the potty after that. (or try to) - No success. He had betadine to the sores after that & lotion & I put clean clothes on him & he went to sleep. Shis got up to eat ~~lu~~ lunch & take pills. Took pills at 11:45 a.m. Ate lunch afterwards. (Food that Tao Brought earlier) Shis laid back down after lunch. Shis has been coughing some. Shis & me took naps during the afternoon. Gave him his evening pills at 4:25 pm. He ate at 4:45 pm. ~~lunch~~ Supper ~~that~~ Tao brought. Laid down & rested awhile. Then he got up & I shaved him.

Thursday - June 29

Shis had kind of a bad night last night. He was up at 1:30 & again at 3 or 4 to pee. A little restless. Finally went to sleep after that. I gave him his breakfast pills around 7:30 a.m. or so. He didn't eat yet. Is sleeping in the bed. Shis ate around 10 a.m. food that tao brought. Then I gave him a shower & lotion & clean clothes. Also betadine on sores. Shis laid back down after his bath. Got up to take his lunch pills at 12:40 p.m. Ate a muffin that jen gave us at 1 p.m. Shis had his little enema & then had a poo after that. Then laid back down awhile. Took a good nap & then ate lunch, late, at 3:45 p.m. Shis rested, then went out on the porch to walk a little. Then came back inside & took his evening meds. (6:35 p.m)

Friday – June 30

Shis was a little restless last night. Called Kuei at 2am. She called me. Apparently, Shis couldn't wake me up. I told her he kept me awake at night. Slept ok the rest of the night, but very sleepy this morning. Was trying to walk with his eyes closed. Finally got him to pee & to the shower & dressed. Lotion to his body & ointments to sores (which are looking better) He took his pills around 9 a.m. Ate at 9:20 a.m. Had egg & Apple cin oatmeal 70%. Got Shis settled back at the restaurant & checked out of the motel. Clean Clothes AGAIN! YA!! He took his lunch pills at 12:55 p.m. Is eating a good lunch, too. I washed up the dirty clothes. Vacuumed the floors, and emptied the trash. Shis still kind of has a cough. Coughed up alot of mucous (clear) at 3:30 p.m. Took BP. It was 110/70 Massaged his feet some. Refilled medication tray. Evening pills at 5:55 p.m. Shis supper after that. Back to bed at 7pm.

July 1 — Saturday

I got here at 11:50 a.m. Shis was lying down. Emptied potty. Took Shis to the shower & gave him a bath Clean clothes & lotion & ointments to his sores. Worst looking one is getting a scab now. Emptied trash, and shaved Shis too! Then massaged his feet. 120/70 BP at resting position. Shis did some stomach exercises in the bed.

July 2 – Sunday

I got here early today 11:40 a.m. Shis was up eating. I emptied the potty & waited for him to finish his food. Then he went to the shower. Had ointments to sores & clean clothes, fresh diaper & lotion to his body. Emptied the trash & vacuumed. No Shane today, No laundry. ☆ One of his pills (Ropinarole) was laying on the floor ☆ don't know from what time. (last night or this morning. Just waiting till lunch to give him another one. Shis took his lunch pills at 1:25 p.m. We played a few minutes of racketball, then took his bp. It was 130/70 milk & cookies at 1:45 p.m.

July 3 – Monday

I got here around noon. Shis had fallen on the floor again. Was "out cold", but awoke when I shook him. Range of motion testing to limbs to asses damage. Then helped him get up. Seemed OK, but a long red place to the left side of his back. May have went to sleep & fell out of the chair. He was walking poorly though. Took him to shower. Did ointments & clean clothes. Cleaned Shis office chair. He finished eating after his shower. I vacuumed. Then he laid down, after I changed the bed. Doing laundry today. Also sprayed & cleaned stains on the carpet. Took BP at 12:05 p.m 110/70. Shis got a Shave after lunch pills at 1:55 p.m. Took out the trash. Had a little cookie for snack. He ate supper at 5:25, after taking evening pills at 5:05 p.m. Leftover noodles & moo goo gaipan & Rice. He took a nap this afternoon. Also some pie I brought him for dessert.

July 4, Tuesday

I got here early at 10:55 a.m. Shis was up eating his breakfast. Laid down after breakfast for 45 minutes. Then I gave him a shower, after he got an enema to poo. Was successful! Ointments to sores & clean clothes & lotion. Vacuumed & took out the trash. Shis cranky last night & today. Took his lunch pills at 12:45 p.m. Ate some egg, pie cherries & cookies after that. Played racketball a few minutes. Took BP afterwards, was low, 88/58? Don't know why.

July 5 – Wednesday

I got here early, at 11a.m. ~~S~~ Shis just finishing his breakfast. Decided he wanted to lay down a bit. Took a little nap. I vacuumed & cleaned bathroom sink, and took out the trash. Also emptied the potty. No laundry today. Got him up at 12:20 pm & took him to the shower. Did his lotion & ointments & gave him clean clothes & diaper. Shis practiced his walking after the shower a little. Took BP afterwards it was 110/60. Shis laid down after walking for a little bit. Got up & took his lunch pills around 1:10 p.m. I Shave him after that. Facial massage with lotion. Shis ate 1 piece of pizza at 1:30 pm. Also muffin & cold soy milk.

July 6 — Thursday

I got here at 9:25 a.m. Took BP 136/78, at 9:40 a.m. Shis says he did not sleep good last night. Time he took meds this morning is unknown? Shis ate his breakfast around 10 a.m. I fixed the pills this morning for the week. After breakfast, Shis took a shower & had lotion, ointments & clean clothes. Then laid down & took a nap. Got Back up & took lunch pills around 12 p.m. Doing laundry today. Shis ate his lunch at 12:20 p.m. Vacuumed & took out the trash. Cleaned out leftover food from the frig.

July 7 — Friday

I got here at 10:50 a.m. Shis was trying to get in the bed & had not taken his morning pills yet. I took him straight to the shower. Got him cleaned up & clean clothes & lotion. He took morning pills at 11:20 a.m. He had already ate something sometime before that, before shower, but had not had them yet. Changed his bed cause their was 1 spot of piss on it. Am also washing his comforter. Will get carpet sprinkles today when I go out. Vacumed the floor, too! Cleaned his sip cup. Shis got up & ate something at 1p.m. Took BP 100/64. Also shaved him. Walked a little, Rested in bed & did stomach exercises with legs. Shis took his lunch pills at 2:05 p.m. Shis ate his lunch at 2:25.

July 8 — Saturday

I got here about 10:45 or so. Shis was on the floor again. Helped him up & he sat in the chair while I vacuumed. Cleaned Black spots in the hallway. Took him to the shower around 12 p.m. Clean diaper & clothes. Also lotion. Shis took his lunch pills + 1 B-12 at 12:25 p.m. Took out the trash. No laundry — No Shave. Shis ate at 12:45 p.m.

July 9 — Sunday

I got here early at 10:35 a.m. Shis was sleeping in the bed. Slept for about 1 hour. I cleaned the potty & toilet in the bathroom. Got Shis up to take a shower. Gave him clean clothes & lotion. He went to eat his lunch. I vacuumed & took out the trash & Did laundry. When he got done eating, I trimmed & filed his finger nails & Shaved him. BP was 100/70. Had a hard time taking it for some reason. Cutting avocados for later. Also gave him a foot massage. Shis laid down a little while. Woke up in an agitated state. Got him up to pee. Trying to take his lunch pills, but is resisting for some reason. Finally took them at 1:40 p.m.

July 10, Monday

I got here around 11 a.m. It was a busy morning. Shis was in the bed (sort of) 1/2 way in or out. I helped him to the bathroom & gave him an ^mini^ enema. He had a poo, ~~&~~ then he took a shower. While he was doing (his business) I rearranged the furniture in the bedroom so the microwave could plug in the wall. After shower Shis had a fresh diaper & clean clothes & lotion. Then he laid down on the bed & took a nap. I scrubbed the carpets. Also vacuumed & took out the trash. 130/76 BP 1:05 pm. Shis took his lunch pills at 1pm or so. No shave today, No laundry. Shis ate some rice ^w meat^ & cookies. Then laid down awhile. Massaged his feet. Did tummy Exercises in the bed. Shis ate Shrimp + vege at 3:40 pm. He ate a little, but didn't like that well. So I ordered some pizza. He ate some at 4:45 p.m. Took ekotrin early. Took the rest of his evening meds at 6:30 p.m. w cool apple juice from the frig.

July 11 — Tuesday

I got here around 11. Shis was sitting on the bed. Took a nap. I vacuumed. He got up around noon & took a shower. Had clean clothes, lotion, fresh diaper. He ate the rest of his breakfast & I changed the bed & did laundry. Changed the trash. Shaved Shis. Took BP 110/70 1:15 pm Took lunch pills around 1:20 pm. Laid down a few minutes.

July 12, Wednesday

Well I got here a few minutes after 11. Shis had fallen ~~a~~ head first off the desk again. But he was ok. Thank you lord! Pillow not in chair. ~~He~~ went to lie down awhile, and then got up around noon to take a shower. He had clean clothes & fresh diaper. Forgot lotion today. Am having to wash his Bathrobe cause I found a dirty (poo poo) place on it. I vacuumed & took out the trash. Emptied the potty first. Got Shis up from a nap at 1:15. He peed and took his lunch pills & B-12 around 1:20 or so. BP was 140/76 at 1:30 p.m.

Came back at 7pm to fix meds for the week. Shis took his evening meds at 7:05 pm & also had a mini enema.

July 12, Wednesday

Well I got here a few minutes after 11. Shis had fallen head first off the desk again. But he was ok. Thank you lord! Pillow not in chair. He went to lie down awhile, and then got up around noon to take a shower. He had clean clothes & fresh diaper. Forgot lotion today. Am having to wash his Bathrobe cause I found a dirty (poo poo) place on it. I vacuumed & took out the trash. Emptied the potty first. Got Shis up from a nap at 1:15. He peed and took his lunch pills & B-12 around 1:20 or so. BP was 140/76 at 1:30 p.m.

Came back at 7pm to fix meds for the week. Shis took his evening meds at 7:05 pm & also had a mini enema.

July 13, Thursday

I got here around 10:50 a.m. Heard a loud thud when I was standing waiting for them to open the door. Came in & Shis had fallen on the box & head w in a precarious position. By the pot chair. Far back & teeth ½ way back in mouth. He appeared to be unresponsive & not breathing. Also could not feel any heartbeat. I shook him & set him up. I heard breath sounds coming from his airway. Also noticed he was breathing lightly. Felt a slow pulse. Took BP & it stayed 100/66 & 100/70 for awhile. He was semi conscience. We laid him down to rest. He slept for about 2 hours. I helped him up & he seemed ok. Went to take a shower. fresh diaper & clean clothes & brought him to chair to eat. Lotion to body & shave today. He ate very well tot. Laid back down awhile. I vacuumed & changed the trash. Shis went to have a poo-poo at 3pm & enema. (or try) Shis took lunch pills at 4:10 p.m.

Right before he woke up BP was 120/70.